**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BARRETT BROWNBRIDGE, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:25-cv-02159-ER |
| Plaintiff, | |
| v. | |
| TFI INTERNATIONAL INC., ALAIN BÉDARD, and DAVID SAPERSTEIN, | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION AND OVERVIEW ................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................................... 3

III.  PARTIES AND RELEVANT NON-PARTIES ..................................................................... 4

   A.  Plaintiff ........................................................................................................................... 4

   B.  Defendants ....................................................................................................................... 4

   C.  Former Employees ........................................................................................................... 6

IV.   SUBSTANTIVE ALLEGATIONS ...................................................................................... 7

   A.  Background Of The Company And The TForce Acquisition ........................................... 7

   B.  Senior Management Was Warned The UPS Integration Cutoff Would Trigger A Sharp
       Volume Decline, Which The Company Failed To Disclose ........................................... 11

   C.  Following The Cutoff, TFI Experienced A Sharp Volume Decline But Failed To Disclose
       The Issue And Misled Investors .................................................................................... 15

   D.  The Truth Partially Emerges And The Concealed Risks Materialize. .............................. 19

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
      OMISSIONS MADE DURING THE CLASS PERIOD ............................................................ 20

   A.  Statements Related To First Quarter 2024 Results ......................................................... 20

   B.  Statements Related To Second Quarter 2024 Results ..................................................... 29

   C.  Statements Related To Third Quarter 2024 Results ........................................................ 32

VI.   ADDITIONAL SCIENTER ALLEGATIONS..................................................................... 43

   A.  Corporate Scienter Allegations ...................................................................................... 44

   B.  Defendants' Access To Information And Core Operations ............................................. 46

VII.  LOSS CAUSATION ......................................................................................................... 48

VIII. CLASS ACTION ALLEGATIONS ................................................................................... 49

IX.   UNDISCLOSED ADVERSE FACTS ................................................................................ 51

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE .................................................. 52

XI.   NO SAFE HARBOR ........................................................................................................ 54

XII.  CLAIMS FOR RELIEF .................................................................................................... 55

XIII. PRAYER FOR RELIEF .................................................................................................... 59

      JURY TRIAL DEMANDED ............................................................................................. 59

Lead Plaintiff Patricia Douglass ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by TFI International Inc. ("TFI" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by TFI; and (c) interviews of former TFI employees; and (d) review of other publicly available information concerning TFI.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of all purchasers of TFI common stock between April 26, 2024 and February 19, 2025, inclusive (the "Class Period") who purchased on a U.S. exchange. Plaintiff pursues claims against the Defendants (defined below) under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.    In 2021, TFI underwent a dramatic transformation from a primarily Canadian regional shipping company to one of North America's largest less-than-truckload ("LTL")[1] carriers when it purchased UPS Freight from United Parcel Service, Inc. ("UPS") for $800 million. Key to the transformative nature of this acquisition was that UPS agreed to continue providing certain services, including technology integrations, to UPS Freight (later renamed TForce Freight) under TFI's ownership after the transaction. As TFI touted, the transaction was particularly attractive

---

[1]    The LTL business focuses on shipments too small to fill an entire truck. It handles the pickup, consolidation, transportation, and delivery of smaller freight loads across regional and national networks.

because UPS provides "[u]ser friendly shipping, visibility and billing technology offerings, including **UPS WorldShip**, Quantum View and UPS Billing Center, [which] allow freight customers to create electronic bills of lading, monitor shipment progress and reconcile shipping charges."[2]

3.      UPS WorldShip is a desktop shipping application that enables shippers to prepare labels, transmit shipment information, schedule pickups, and integrate data with UPS's systems. WorldShip can be connected to other business systems, such as enterprise resource planning, inventory management, and order management software. Therefore, many businesses, especially those with high-volume shipping needs, have integrated workflows for shipping freight using WorldShip.

4.      Three years after the acquisition, on May 1, 2024, access to the UPS WorldShip platform, which many customers still used, was cut off. Internally, TFI senior management was warned that a significant portion (roughly 10%) of TForce Freight volume was booked through WorldShip, and that those customers had not migrated to TFI's self-hosted platform. However, in the lead up to this vital cutoff, management failed to disclose that the termination of the WorldShip integration would lead to a sudden, sharp volume loss, as customers who previously scheduled pickups with TFI through WorldShip could no longer do so using that platform. When TForce was finally cut off from WorldShip in May 2024, it faced a sudden, significant volume loss for multiple quarters. Despite this, TFI continued to withhold vital information about the significant effects the discontinuance of the UPS WorldShip integration had caused.

---

[2]      TFI International, SEC Form 6-K, Exhibit 99.1, *Business Acquisition Report*, filed Sept. 2, 2021. Available at https://www.sec.gov/Archives/edgar/data/1588823/000156459021046983/tfii-ex991_7.htm. Last accessed on Oct. 21, 2025.

        Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

5.    Finally, after the market closed on February 19, 2025, the truth emerged and/or undisclosed risks materialized when TFI announced its full fiscal year 2024 financial results in a press release, revealing losses that shocked investors: net income had declined 33% year-over-year in the fourth quarter and more than 16% year-over-year for the full year, and earnings per share had declined more than 32% year-over-year in the quarter and 14.5% year-over-year for the full year. Moreover, the Company's largest single contributor to its revenue, the LTL segment, was down 33% year-over-year in the quarter and 15% year-over-year for the fiscal year in operating income, and 9% year-over-year in the quarter and nearly 5% year-over-year for the fiscal year in revenue (excluding fuel surcharge).

6.    In an earnings call held the next day before the market opened on February 20, 2025, the Company's Chief Executive Officer, Alain Bédard ("Bédard") admitted a cause of the poor results was "losing the small and medium-sized, [] customers, which have the best margin" . . . "[a]nd this was really accelerated in Q4." Bédard further admitted "We're getting also killed because our *volume keeps dropping. Our shipment count is down 6% year-over-year.*" Bédard concluded "*[t]he volumes are not there.* So it's going to be a difficult '25," and "*our volume, okay, keeps coming down, right? So it's like you're chasing your tail, like a dog chasing his tail*, okay?"

7.    On this news, TFI's stock price fell $26.13, or 20.5%, to close at $101.48 per share on February 20, 2025, on unusually heavy trading volume, wiping out $2.049 billion of market capitalization in one day.

## II.    JURISDICTION AND VENUE

8.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiff

12.     Lead Plaintiff Patricia Douglass, as set forth in the certification previously filed with the Court, incorporated by reference herein (ECF No. 10-2), purchased TFI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.     Defendants

13.     Defendant TFI is incorporated under the laws of Canada with its principal executive offices located in Quebec, Canada. TFI's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "TFII."

14.     Defendant Bédard was the Company's Chief Executive Officer ("CEO") at all relevant times. Bédard has served as Chairman, President, and CEO of TFI since 1996. Bédard began his career at KPMG in 1975. He rose to become a senior auditor within three years while

4

obtaining his CA and CMA designations. Bédard was awarded the title of Fellow by the Quebec FCPA (Fellow of Chartered Public Accountants) Order in February 2011.

15.     Throughout the Class Period, Bédard spoke to investors and analysts on conference calls. Bédard possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, Bédard signed and certified the accuracy of TFI's quarterly interim financial reports and interim MD&A (together, the "interim filings") submitted to the SEC, for the fiscal quarters ended March 31, 2024, June 30, 2024, and September 30, 2024.

16.     Defendant David Saperstein ("Saperstein") was the Company's Chief Financial Officer ("CFO") at all relevant times. Saperstein was appointed CFO in November, 2018. Saperstein joined TFI in 2016 as vice president of mergers and acquisitions after spending 15 years in investment banking at several firms in the United States and Europe, including Goldman Sachs. Saperstein joined TFI as Vice-President, Mergers & Acquisitions, a role in which he focused on M&A activities throughout the North American transportation industry and led the TFI International team in assessing and coordinating potential opportunities.

17.     Throughout the Class Period, Saperstein spoke to investors and analysts on conference calls. Saperstein possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, Saperstein signed and certified the accuracy of TFI's interim filings submitted to the SEC, for the fiscal quarters ended March 31, 2024, June 30, 2024, and September 30, 2024.

18.     Defendants Bédard and Saperstein (together, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual

Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

     **C.**    **Former Employees**

     19.    Between 2014 and 2024, Former Employee #1 ("FE1")[3] held various positions at both TForce Freight, a subsidiary of TFI acquired in 2021, and UPS Freight, a predecessor subsidiary of UPS that was rebranded as TForce Freight in connection with TFI's acquisition. At TForce, FE1 served as Vice President of Engineering from November 2022 to August 2024, Vice President of Engineering & Fleet from January 2022 to November 2022, and Lead Director of Engineering from May 2021 to January 2022. Prior to the acquisition, FE1 served at UPS Freight as Lead Director of Engineering from January 2021 to May 2021, Regional Director of Operations from February 2020 to January 2021, Regional Industrial Engineering Manager from January 2016 to February 2020, and Regional Industrial Engineering Supervisor from July 2014 to January 2016.

     20.    Former Employee #2 ("FE2") was a TForce Regional Sales Director from August 2021 to February 2025, and an Area Sales Manager from May 2021 to August 2021. Prior to that, FE2 was an Area Sales Manager at UPS Freight from January 2000 to April 2021.

     21.    Former Employee #3 ("FE3") was a Sales Account Executive with TForce Freight from January 2023 to March 2025.

---

[3] To protect their anonymity, all former employees are identified using the masculine pronoun.

22.    Former Employee #4 ("FE4") was a Director of Sales, West Region, with TForce Freight from December 2023 to January 2025, and an Area Sales Manager with TForce from April 2021 to December 2023. Prior to that, FE4 worked at UPS Freight starting in approximately 2006.

23.    Former Employee #5 ("FE5") was a TForce Freight Sales Account Executive from November 2022 to March 2024. Prior to that FE5 was an UPS Freight Account Executive from February 2021 to May 2022, and Operations Supervisor from July 2018 to January 2021.

24.    Former Employee #6 ("FE6") was a TForce Freight Sales Account Executive from July 2023 to September 2024. Prior to that FE6 was a Sales Account Executive at UPS Freight from August 2019 to April 2021.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background Of The Company And The TForce Acquisition

25.    TFI was founded in 1957 as a regional trucking service in Quebec, Canada. As the Company grew, it set its sights on the U.S. domestic market. Under the leadership of Bédard, who has served as Chairman, President, and CEO of TFI since 1996, the Company has grown substantially through strategic acquisitions, completing over 190 acquisitions between 1996 and 2021. The Company's ambitions to extend to the U.S. have largely come to fruition; as of 2025, approximately 70% of TFI's business is now domestic, approximately 25% is within Canada, and the rest is cross-border.

26.    Key to the Company's success in expanding into the U.S. market was its transformative purchase of UPS Freight in 2021.

27.    On January 25, 2021, TFI announced that it had entered into a definitive agreement to acquire the less-than-truckload ("LTL") and dedicated truckload ("TL")[4] divisions of UPS,

---

[4]    The Dedicated Truckload ("TL") business provides full-truckload transportation services, moving entire shipments directly from origin to destination for a single customer, often using

together dubbed "UPS Freight." At the time of the announcement, UPS Freight was reported to have generated approximately $3 billion in annual revenue in fiscal year 2020 and to have been "approximately break-even" on an operating income basis.[5] The acquisition would thus effectively double the revenue of TFI, whose entire fiscal year 2020 revenue was only $3.8 billion. The Company touted the approximately $800 million acquisition as key to the Company's "***strategic expansion across the US and aligning with UPS.***"[6] TFI indicated that the acquisition would significantly expand its North American LTL footprint, provide broader network reach across the U.S., Canada, and Mexico, and Bédard stated the acquisition would create "what we believe to be ***North America's single most comprehensive LTL network***."[7]

28.    Under the terms of the agreement, TFI planned to operate the LTL business, which comprised about 90% of the acquired operations, independently within its existing LTL business segment under a new brand name, "***TForce Freight***" ("TForce").[8] TFI touted the transaction as a long-term opportunity to improve TForce Freight's operating margin through separate management of LTL and dedicated TL businesses, and to improve operating efficiencies.[9]

29.    Key to the transformative nature of the acquisition was that ***UPS agreed to continue to provide freight volumes and other distribution infrastructure services to TForce Freight after***

---

specialized or dedicated equipment and offering services such as expedited, flatbed, tank, and container transport.

[5]    TFI International, SEC Form 6-K, Exhibit 99.1, Press Release, January 25, 2021. Available at https://www.sec.gov/Archives/edgar/data/1588823/000119312521015503/d104201dex991.htm Last accessed on October 22, 2025.

[6]    *Id.*

[7]    *Id.*

[8]    The remaining approximately 10% of the acquisition, primarily dedicated TL assets, were folded into TFI's TL business segment.

[9]    *Id.*

*the transaction*. Specifically, according to UPS's quarterly report for the period ended September 30, 2021, UPS and TFI "entered into an agreement for UPS Freight to continue to utilize our U.S. Domestic Package network to fulfill shipments for an initial period of five years. ***UPS also agreed to provide certain other services to TFI for a transitional period***." This arrangement was designed to preserve and leverage UPS's existing package distribution infrastructure. As TFI itself stated, the transaction was particularly attractive because UPS provides "***[u]ser friendly shipping, visibility and billing technology offerings, including UPS WorldShip,*** Quantum View and UPS Billing Center, [which] allow freight customers to create electronic bills of lading, monitor shipment progress and reconcile shipping charges."[10] A key element of the acquisition included UPS agreeing to allow TFI and TForce to continue using these key technology tools and offerings, including UPS's suite of freight-related software.

30.    UPS's suite of user-friendly shipping platforms includes UPS WorldShip, a desktop shipping application that enables shippers to prepare labels, transmit shipment information, schedule pickups, and integrate data with UPS's systems (e.g., manifesting, rating, tracking). UPS also operates a variety of related shipping software applications, including UPS CampusShip, the UPS website, and the UPS Shipping API, which directly connects customers to UPS shipping solutions through various e-commerce platforms.

31.    However, as investors would later discover, some of these key functions would only be available to TForce until around May 1, 2024; and it would be up to TForce to effectively transition customers onto its own technology, lest it face a sharp decline in volume once access to UPS's supporting infrastructure was discontinued.

---

[10]    TFI International, SEC Form 6-K, Exhibit 99.1, *Business Acquisition Report*, filed Sept. 2, 2021. Available at https://www.sec.gov/Archives/edgar/data/1588823/000156459021046983/tfii-ex991_7.htm. Last accessed on Oct. 21, 2025.

32.    TFI's acquisition of UPS's business unit closed on April 30, 2021. Upon closing, the business formerly known as UPS Freight was renamed TForce Freight and began operations as an independent unit within TFI's LTL segment.

33.    TFI lauded the transaction as immediately revenue-generative; according to the Company's fiscal 2021 second quarter report, TFI's LTL segment revenue increased significantly in the quarter immediately following the close of the transaction, with TForce generating $481 million in the two months following the completion of the acquisition. TFI also stated that it had immediately "***identified hundreds of low yield accounts and has already implemented actions on selected accounts to increase the quality of freight***."[11]

34.    It appeared that the acquisition of TForce Freight succeeded in immediately increasing TFI's U.S. domestic revenue mix. According to the Company's fiscal year 2021 and 2022 annual reports, from 2021 to 2022, TFI's U.S. LTL revenue grew by 37.9%, while its Canadian LTL revenue shrank by 1.6%. According to the same annual reports, U.S. LTL went from generating a negligible and unreported percentage of the Company's LTL revenue, to representing 74% of all LTL revenue by 2021, and 80% by 2022. This shift allowed TFI to become a more North American-focused company, aligning its commercial presence and shareholder base with the U.S. market. TForce Freight essentially provided TFI with a national LTL network in the U.S., something TFI previously lacked.

---

[11]    TFI International, SEC Form 6-K, Exhibit 99.2, *Second Quarterly Report for the Three Month Period Ended June 30, 2021*, filed July 26, 2021. Available at https://www.sec.gov/Archives/edgar/data/1588823/000156459021037948/tfii-ex992_73.htm. Last accessed on Oct. 21, 2025.

**B.      Senior Management Was Warned The UPS Integration Cutoff Would Trigger A Sharp Volume Decline, Which The Company Failed To Disclose.**

35.      As the Company entered fiscal year 2024, it approached the cutoff date for certain UPS tools, including WorldShip. Per the terms of the acquisition, key UPS user functionalities including WorldShip would only be available until May 1, 2024. According to former employees, TFI was insufficiently prepared for the cutoff, and TFI senior management had been repeatedly warned the cutoff would lead to a sharp decline in volume. Yet the Company failed to disclose this information and instead offered misleading statements to investors about its technology transition.

36.      According to FE1, as the cutoff date for WorldShip approached, FE1 had started to raise a red flag to FE1's superiors and warn that TForce had "a problem" with respect to TForce's transition from the WorldShip platform. FE1 was TForce's Vice President of Engineering between November 2022 and August 2024. During the latter half of 2023 and throughout 2024, FE1 reported to TForce President Keith Hall ("Hall"). Hall reported to Bédard. According to FE1, there was also a "very clear dotted line" between Hall and Bob McGonigal ("McGonigal"), TFI's Executive Vice President in charge of U.S. LTL operations, such that Hall reported directly to Bédard, but "everything passed through Bob McGonigal."

37.      During FE1's tenure as Vice President of Engineering, FE1 attended multiple meetings, including monthly group meetings and weekly staff calls. The monthly group meetings would generally include Bédard, Paul Hoelting (the president of TForce until approximately June 2023, when Hoelting retired and Hall succeeded him in that position), and Hall, among other executives. FE1 did not attend all of these group meetings, but he attended many of them. FE1 would also participate in weekly staff calls on Tuesdays "three or four weeks a month," and these meetings would include Hall, McGonigal, and every TForce department head, among others. According to FE1, Bob McGonigal was "always on that call, unless he was on vacation. He would

11

cancel meetings to be there." In addition to McGonigal, other high-ranking TFI executives and officials would periodically attend these weekly calls, including: TFI Executive Vice President Chris Traikos, TFI Executive Vice President Rick Hashie, TFI Vice President Norman Brazeau, and TForce Vice President Ping Yan. In addition to these weekly staff calls on Tuesdays, FE1 also participated in "Friday recap call[s]" to discuss items that had been raised during the Tuesday calls. These calls often included Bob McGonigal, Keith Hall, Norman Brazeau, and Chris Traikos.

38.     As the Vice President of Engineering, one of FE1's main responsibilities was to analyze TForce's shipping volume and the sources of that volume. As the WorldShip transition date approached, FE1 observed that a significant portion of TForce's volume originating through the WorldShip platform and that this volume was not decreasing as the cutoff date approached. FE1 warned executives at TForce and TFI that once access to WorldShip ended, there would be a significant and immediate decrease in TForce's volume.

39.     According to FE1, there were multiple ways that a shipping order could be initiated with TForce, including, among other things, calls placed to a TForce service center, calls placed to TForce's 1-800 customer service number, WBU (a UPS website), EDI (electronic data interchange), APIs, WorldShip, and handheld devices used by delivery drivers called a DIAD (delivery information acquisition device). FE1 stated that orders placed through WorldShip represented a significant portion of TForce's volume, comprising roughly 10% of TForce's overall volume. FE1 stated that, as the cutoff date for WorldShip approached, FE1 would "continue to see customers not moving off of WorldShip. I continue to see WorldShip isn't reducing its share of total volume."

40.     During the weekly staff calls, FE1 would present a slide deck summarizing engineering division projects, deadlines, and updates. Beginning in November 2023, FE1 began

including a slide, roughly every other week, that detailed the volume of TForce freight coming in from various sources, including WorldShip. The slide, based on data from TForce's dispatch reservation system ("DRS"), would show the percentage of TForce's volume that was generated through WorldShip as opposed to other channels. Over time, FE1 observed that the percentage of TForce's volume attributable to WorldShip was not decreasing, indicating that once access to WorldShip ended, TForce faced the likelihood of a sudden material drop in volume.

41.    On several occasions, FE1 raised concerns at weekly staff meetings about the continued significant volume being generated through WorldShip, even though WorldShip was being phased out. FE1 asked, "Do we have a strategy of how we're transitioning our customers?" According to FE1, the sales team responded, "yup, we got it; not a concern." However, FE1 continued to analyze the data over time and saw that the volume from WorldShip was not decreasing or shifting to alternative channels for placing an order. FE1 stated, "I continue to see customers not moving off of WorldShip. I continue to see WorldShip isn't reducing its share of total volume. . . . I continue to see it not moving. . . . So, every week, or every other week . . . I'm really digging into my partners on the executive staff, saying, 'What's going on here?'" FE1 noted that "Keith [Hall] and Bob [McGonigal] were at every call."

42.    FE1 recalls one occasion where Charles Purvis, director of sales operations, or a member of Purvis's team, validated FE1's analysis of the data. FE1 stated, "Either Charles Purvis or someone in his hierarchy . . . . They had access to the same data as me," but with a "different lens. . . . They could see significant volume loss. . . . They told me, 'Your analysis of data is correct, and it looks like there will be a volume loss, day one [following the cutoff from WorldShip]. They were responsible for building a plan, for how not to lose volume."

13

43.    FE1 also recalls an instance, during a meeting in TForce's headquarters in Richmond, Virginia, at which FE1 raised concerns about volume loss due to the coming cutoff of WorldShip. Both Keith Hall and Bob McGonigal were present at the meeting. FE1 stated that he was "presenting the PowerPoint, and talking through . . . WorldShip," when Hall interrupted and stated, "We've heard you talk about this a few times. Let's table this, and talk about this with Doug [Reisberg] and Nate [Leonard]."[12]

44.    According to FE1, "within eight weeks of exiting the WorldShip platform," FE1 became a "nervous wreck" because FE1 saw "the volume is not going down." "Four weeks out, I'm questioning leadership: '*Why are we not moving on this?*'" "Two weeks before," continued FE1, "*I have hit the panic button,* and I think the rest of the staff are starting to see it too. . . . And we're discussing volume loss. . . . I offer the senior staff – because of the severity – *I say, 'Guys, we have two weeks to go; I don't see this moving. You're telling me it's an all-hands-on-deck process, and you're having success converting customers, which I'm not seeing.* I will dedicate my staff, for the next two to three weeks [to assist with the transition].' Because, to me, it's mission-critical, to not lose this volume."

45.    According to FE1, FE1 made this offer to dedicate FE1's staff to the transition process on the staff call "in front of Bob McGonigal," because FE1 wanted to indicate to the other members of the executive team that "I will do everything you need, to not lose this volume . . . . [b]ecause I knew, if we lost that volume, there'd be another layoff." Bob McGonigal and Keith Hall, however, did not take up FE1 on this offer.

---

[12]    Doug Reisberg is a Vice President of U.S. sales and specialty markets at TForce, and Nathan Leonard is a Vice President of pricing and customer experience at TForce.

46.     Other former employees corroborate FE1's account. According to FE2, a TForce Regional Sales Director, the impact of the upcoming cutoff date for UPS technology and WorldShip was well understood.[13] FE2 stated, "***We all knew it, internally . . . . all of us knew it was going to be a problem. . . . We knew we had three years to come off of it, and they talked about it and talked about it, but it never got traction. And we talked about it with the vice president of sales***." FE2 participated in weekly sales calls, including during the third and fourth quarters of 2024, with Hall and McGonigal. for the purpose of "[d]rilling down on sales numbers."

47.     FE5 described the period preceding the UPS service cutoff date as "the messiest divorce I've ever seen of a company."[14]

### C.     Following The Cutoff, TFI Experienced A Sharp Volume Decline But Failed To Disclose The Issue And Misled Investors.

48.     On or about May 1, 2024, UPS stopped supporting TForce Freight through UPS WorldShip, the UPS APIs, or the UPS website.[15]

---

[13]     FE2 was responsible for overseeing sales in the Midwest region. In the course of FE2's official responsibilities, FE2 became familiar with the problems associated with the Company's customer loss due to the UPS technology cutoff. FE2 interacted directly with senior corporate officers at TFI; FE2 participated in weekly calls with Hall and McGonigal. McGonigal reported directly to Bédard, and worked side-by-side with Hall. FE2 reported directly to Dean Mills ("Mills"), in his role as regional director of operations, and later to Doug Riesberg, who later assumed that role when Mills became Vice President of Sales for North America.

[14]     FE5 was a Sales Account Executive at TForce. In the course of FE5's official responsibilities, FE5 became familiar with the problems associated with the Company's customer loss due to the UPS technology cutoff. FE5 interacted directly with senior corporate officers at TFI, including Hall, McGonigal and Mills, at a February, 2024 regional sales meeting. FE5 also had weekly operations meetings with regional vice president Ryan Rakosky. During these meetings, the issue of losing customers came up often.

[15]     *See* TForce Freight, *TForce Freight CIAM Migration Guide*, April 29, 2024. Available at https://web.archive.org/web/20251021163635/https://www.tforcefreight.com/downloads/TForce Freight-MyLTL-CIAM-UserExperience.pdf. Last accessed on Oct. 21, 2025.

49.     Internally, TForce experienced a significant operational disruption as it was cut off from its critical UPS systems including WorldShip. FE1 stated that, when the transition day arrived, *as of "day one," there was "significant volume loss,* and I'm freaking out, personally." Still, FE1 said, "The president of the company [Keith Hall] is blowing me off." FE1 recalled, "I'm asking why this happened, how this happened, and I'm not getting anything."

50.     According to FE2, immediately following the cutoff date, "*[i]t was a dramatic drop. You could see the drop in business; it started in June, July, 2024. And it was across all segments. And a lot of it had to do with internal tech issues.*" "We came off of the UPS technology in June of 2024. . . . That was when we were 100%, completely, off the UPS technology. *So, at that point, the problems started getting exponentially worse.*" FE2 explained that, in part the issue was "Everything went to the manual technology, at that point." FE2 stated that TForce "had some tech that was in place, but there were a lot of bugs in it" and "what we had in place just wasn't working. Pricing, cost, customer profile had to be entered manually. Then errors occurred, and there are only so many people in that department. . . . You would have customers that would ship with us for 30 days, and wouldn't even get an invoice, because pricing hadn't even loaded yet."

51.     FE3 confirmed that the transition off UPS software was the source of the Company's dramatic loss of small and medium-sized customers. FE3 stated *"We let people know, in May or July of 2024, that we were taking people off the WorldShip platform . . . . When that happened, revenue dropped across the country."*[16] FE3 discussed customer loss and service issues

---

[16]     FE3 was a Sales Account Executive at TForce. In the course of FE3's official responsibilities, FE3 became familiar with the issues concerning the separation from WorldShip software in mid-2024 leading to the loss of customers. FE3 interacted directly with senior corporate officers at TFI, including Dean Mills, TForce's Vice President of Sales for North America, at regional meetings and national calls with all sales employees. FE3 received daily revenue reports by email beginning in approximately early 2024, from his manager, sales director

with both the TForce Director of Sales, Lucas Ward, and business manager Benjamin Guilford. Lucas Ward reported to Dean Mills, TForce's Vice President of Sales, North America.

52.    FE6 echoed this narrative. FE6 stated that TForce "had a problem detaching from the UPS software." "Our technology was completely intertwined. . . . ***When we tried to move away completely from UPS, that's when we started having issues*** . . . . The backlash was that we started missing pickups, for our small market business customers. . . . After 3 times of saying, 'We are going to fix it,' and it doesn't get fixed, then they just stop using you."[17]

53.    Customers, apparently, echoed a similar sentiment.

54.    In October, 2024, the results of the Mastio survey for 2024 came out. The Mastio survey is an independent annual study conducted by Mastio & Company that measures customer satisfaction, loyalty, and value perceptions among shippers who use freight carriers. It provides industry-leading data to help companies understand their competitive position and make strategic decisions. The survey gathers feedback from hundreds of shippers on factors like timeliness, pricing, and responsiveness.

55.    In 2024, Mastio recorded approximately 5,000 observations from 1,608 LTL shippers through a series of phone interviews with "key decision-makers" conducted from June

---

Lucas Ward. FE3 discussed customer loss and service issues with both Ward and business manager Benjamin Guilford.

[17]    FE6 was a Sales Account Executive at TForce. In the course of FE6's official responsibilities, FE6 became familiar with the manner in which technological issues contributed to the loss of customers, including problems detaching from the UPS software. FE6 and other sales executives had weekly meetings with management, including Glenn Pulley, an area sales manager, and the operations team, to discuss their customers. FE6 also attended quarterly town hall meetings, led by TFI Vice President Dean Mills.

through the end of September, 2024.[18] Results of the survey came out on October 15th, 2024. The survey in 2024 rated 164 carriers, with only 23 garnering enough ratings to make the list. Of those 23, TForce ranked last.

56.     Despite these known problems contributing to significant customer loss and revenue declines throughout the Class Period, Defendants concealed the issues from investors and instead misled investors about the drivers of the Company's volume loss and customer churn.

57.     For example, on April 26, 2024, Defendants conducted an earnings call to discuss TFI's financial results for first quarter of fiscal year 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, an analyst asked about a recession in the broader U.S. freight market and whether TForce could sustain positive momentum on yields and volumes, notwithstanding this negative economic environment. Defendant Bédard responded by describing steps TForce was taking to improve its billing systems and replace its legacy systems, without acknowledging the operational setbacks and volume losses that Defendants expected due to the imminent cutoff of WorldShip.

58.     Similarly, on October 22, 2024, Defendants conducted an earnings call to discuss TFI's financial results for third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendants acknowledged that TForce's poor service was causing high customer churn, but failed to disclose the principal factor driving the loss of customers: the exit from WorldShip. For example, Bédard stated that "***if you don't provide the right service, then, [the customer is] going to walk, and you're going to have lots of churn. So that's one thing that at TForce Freight we have, right? We have too much churn. . . . So, you got to fix the service, so***

---

[18]     *See* Mastio, LTL Study, 20th Edition - 2024 (National Carriers), Press Release, October 15th, 2024. Available at https://mastio.com/wp-content/uploads/2024/10/LTL_20th_Press_Release_2024-1.pdf. Last accessed on Oct. 24, 2025.

*that you can reduce the churn of customer.*" As FE2 explained, however, the "biggest reason" for the decline in customers was the termination of WorldShip without an adequate alternative in place. *See* ¶62, *infra*.

      **D.**    **The Truth Partially Emerges And The Concealed Risks Materialize.**

    59.    On February 19, 2025, after the market closed, TFI announced its fourth quarter and full year 2024 financial results in a press release, revealing losses that shocked investors: net income had declined 33% year-over-year in the fourth quarter and more than 16% year-over-year for the full year; and earnings per share had declined more than 32% year-over-year in the quarter and 14.5% year-over-year for the full year. Moreover, the Company's largest contributor to its revenue, the LTL segment, was down 33% year-over-year in the quarter and 15% year-over-year for the fiscal year in operating income; and 9% year-over-year in the quarter and nearly 5% year-over-year for the fiscal year in revenue (excluding fuel surcharge).

    60.    On February 20, 2025, before the market opened, TFI held a conference call in connection with these financial results. During the call, Defendant Bédard revealed that the Company is "losing the small and medium-sized . . . customers, which have the best margin" and this "*really accelerated in Q4*." Bédard further admitted "[w]e're getting also killed because our volume keeps dropping. Our shipment count is down 6% year-over-year." Bédard concluded "*[t]he volumes are not there*. So it's going to be a difficult '25"; "our volume, okay, keeps coming down, right? So it's like you're chasing your tail, like a dog chasing his tail, okay?"

    61.    On this news, TFI's stock price fell $26.13, or 20.5%, to close at $101.48 per share on February 20, 2025, amid unusually heavy trading volume.

    62.    FE2 confirmed that, while the Company eventually disclosed losses among small and mid-sized customers, the truth was "the **biggest reason** [for the loss of small and mid-sized customers] is we had shipping software called UPS WorldShip, and those middle market customers

used UPS WorldShip . . . to process shipping documents and get rate quotes. ***And, in June 2024,***

***they came off that program.*** And larger accounts were not on UPS WorldShip. It was basically

built for middle-market customers. ***And when we came off that software, it was a dramatic drop***

***in customers.*** Our website was not a good alternative solution, because we had the same website

in 2005, when UPS brought [sic] us. It wasn't a good fallback."

63.    FE4 similarly echoed that the issue was the WorldShip cutoff, "the platform for

shipping; we pulled out, in the middle of the year, and we lost some mid-market or smaller

business, which are typically profitable."[19] Said FE4, "It was a difficult process, through that

integration time" and "I heard from customers: 'You're already a terrible carrier; ***now, I can't use***

***your platform. Now, I'm moving on.***'"

64.    FE5 similarly stated that technological issues stemming from UPS technology

cutoff contributed to the loss of small and medium customers. "The complete separation of TForce

from WorldShip . . . created a problem with customer loyalty . . . . There were a lot of challenging

issues, of getting people to stick with us," said FE5.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

### A.    Statements Related To First Quarter 2024 Results

65.    The Class Period begins on April 26, 2024. On April 25, 2024, after market close,

TFI filed its 2024 First Quarter results on a Form 6-K with the SEC (the "1Q24 6-K"). Attached

---

[19]    FE4 was a Director of Sales for the West Region. In the course of FE4's official
responsibilities, FE4 became familiar with drivers of the Company's loss of mid-market or smaller
business. FE4 interacted with senior corporate officers at TFI, including Bédard on at least one
occasion in February 2024, along with other regional sales directors, McGonigal, and Hall. FE4
met with McGonigal approximately five times over the course of 2024. FE4 also met at least once
a quarter, in group settings, with Hall. FE4 reported to Mills.

as Exhibit 99.2 to the 1Q24 6-K was the Company's Management Discussion & Analysis for the period ended March 31, 2024 (the "1Q24 MD&A"). The 1Q24 MD&A purported to warn of certain "risks and uncertainties" which "may" or "could" impact the Company, including the following, in relevant part:

> **Acquisitions and Integration Risks**. Historically, acquisitions have been a part of the Company's growth strategy. The Company *may* not be able to successfully integrate acquisitions into the Company's business, or *may* incur significant unexpected costs in doing so. Further, the process of integrating acquired businesses *may* be disruptive to the Company's existing business and may cause an interruption or reduction of the Company's business[.]

> \*                    \*                    \*

> Given the nature and size of UPS Freight, as well as the structure of the acquisition as a carveout from UPS, the acquisition of UPS Freight presents the following risks, in addition to risks noted elsewhere in these risk factors:

> • a large portion of the business of UPS Freight prior to the acquisition was with affiliates of UPS. While there are transportation service agreements in effect with such affiliates of UPS, such affiliates may decide to reduce or eliminate business with the Company in the future and we have limited contractual protections to prevent the loss of such business;

> • *some of the information and operating systems of UPS Freight were integrated with UPS prior to the acquisition. The Company is in the process of transitioning such systems and could experience disruptions during the transition or difficulty or delay in building its systems and personnel to operate them*;

> • the Company had limited experience in the U.S. LTL market prior to the acquisition and we may be unsuccessful in integrating UPS Freight and operating it profitably;

66.    The statements in ¶65 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    The contingent statement that the Company "*could* experience disruptions during the transition" away from UPS Freight operating systems implied the Company had not yet experienced material disruptions at that time, when in fact the Company had already experienced material disruptions;

(b)     The contingent statement that the Company "***could*** experience . . . difficulty or delay in building its systems" to replace the UPS Freight systems implied the Company had not yet experienced material difficulties or delays in building those systems, when in fact the Company had already experienced material difficulties and delays in building replacement systems;

(c)     The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)     TForce was about to be cut off from UPS's WorldShip platform within a week;

(2)     Despite efforts to steer customers to alternative channels for placing orders, TForce management had been unsuccessful in decreasing volume originating through WorldShip;

(3)     TForce employees had warned senior TFI management that TForce would experience a material loss of volume immediately upon the cutoff of WorldShip; and

(4)     TForce had not yet developed systems adequate to replace WorldShip; and

(d)     As a result of the foregoing, the risk had already materialized in substantial part, and the risk of further disruptions, difficulties, and delays was materially higher than Defendants' statements suggested.

67.     Attached as Exhibit 99.4 to the 1Q24 6-K, was a Certification of the interim financial report and interim MD&A signed by Defendant Bédard. The Certification stated that

Bédard had "reviewed the interim financial report and interim MD&A." The Certification further stated:

> **No misrepresentations:** Based on my knowledge, having exercised reasonable diligence, *the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made*, with respect to the period covered by the interim filings.

68.    The statements in ¶67 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons as set forth above in ¶66 with respect to the statements in ¶65. The failure to disclose the material facts identified in ¶66(c)(1)-(4) rendered the 1Q24 MD&A materially misleading and thereby rendered Bédard's Certification of that MD&A materially misleading.

69.    Attached as Exhibit 99.5 to the 1Q24 6-K, was a Certification of the interim financial report and interim MD&A signed by Defendant Saperstein. The Certification stated that Saperstein had "reviewed the interim financial report and interim MD&A." The Certification further stated:

> **No misrepresentations:** Based on my knowledge, having exercised reasonable diligence, *the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made*, with respect to the period covered by the interim filings.

70.    The statements in ¶69 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons as set forth above in ¶66 with respect to the statements in ¶65. The failure to disclose the material facts identified in ¶66(c)(1)-(4) rendered the 1Q24 MD&A materially misleading and thereby rendered Saperstein's Certification of that MD&A materially misleading.

71.    On April 26, 2024, TFI hosted the 1Q24 Earnings Call. During the 1Q24 Earnings Call, an analyst asked about TFI's "momentum" with respect to its TForce business, noting that

the business appeared to have "some nice movement in yields and volume and just things moving . . . in the right direction" and asking whether TForce could "continue" that positive momentum, even with the "backdrop" of a "freight recession" in the "broader U.S. freight market." Bédard responded by noting that TFI had acquired TForce three years ago and that it was in the process of improving its systems to reduce costs. Specifically, with respect to TForce's technology systems, Bédard noted that its TForce's technology was "old," that its old systems were causing problems with billing customers, and that TForce would be implementing a new billing and master file system by the end of the year:

> Brian Ossenbeck [Analyst, J.P. Morgan]:
>
> Thanks for that, Alain. Appreciate it. So the follow-up would be just on TForce's freight in that backdrop you just outlined with the freight recession continuing, maybe you can talk about some of the momentum that seems to be building there, especially with the weight per shipment moving up. Looks like some nice movement in yields and volume and just things moving looks like in the right direction. So, can that continue even if you do have that sort of backdrop you outlined with the broader U.S. freight market?
>
> Alain Bédard:
>
> Well, you see, Brian, we've been educating our sales team to bring freight that fits the model, right? So we've been saying, guys, don't bring us freight that average weight is 1,075 pound per shipment like it was. So finally, for – I mean, don't forget we bought this company three years ago, right, in May. So it took us, let's say, two years just to try to convince these guys that, because you're paid by the weight, why would you haul light shipment? I mean, this is stupid, right? But it change – it takes a long time to change this mentality. The pricing also was bad, okay? And that puts us in a very non-competitive when the shipments were heavy. So we've – we had to change that. We had to change the culture. We have to change a lot of things. Now, we're not done. Because we still drive too many miles between each and every stop. That kills our density compared to what we have in Canada.
>
> We still don't pick up enough freight per sub, okay? So this is also part of the major improvement that we need to happen for TForce freight to come into an 85, 80 – 80% to 85% operating ratio down the road, right? So the job is not done.
>
> Now, for sure, we understand that the freight environment, even in the LTL, is soft, right? Our focus right now is, like we just said on these three factors, weight, okay, density, etcetera, etcetera. But also at the same time, we are working hard, very hard

at reducing the cost. We say that the tiger is always the last one to survive in the jungle. And at TForce Freight today, I mean, *we're a bunch of fat cows, okay? We are way too fat. We have too many clerks. We have too many because our technology is so old, okay, that it takes an army of people to service our customer. And this is something that is ongoing right now.* Okay?

So as an example, *we will be improving our freight billing system, our master file, okay, by the end of the year, which is causing us a lot of problem right now with billing our customers, right? We have too many issues with that and we have too many people at the same time. So this new tool that's supposed to be implemented by year-end is going to help us with that. Our new tool on the linehaul, because one of the reason that we're going to be doing better is our services are also improving.* So missed pickup is improving. We put more freight on the road, okay, versus, let's say, a year ago, the linehaul, we use less rail. Okay? So rail used to be a big portion of our linehaul. Now the portion of rail is reducing, and our own linehaul is picking up speed. So I think that pretty soon we're going to be doing probably like 60% of the linehaul miles will be our own guys, let's say within a year or two, so – in order to, again, improve service.

So to me, Brian, I mean, we still have a lot of work to do over there, but we know what to do. That's the – the beauty is we have to execute and we're just starting to see a little bit of improvement of our execution.

72.    The statements in ¶71 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

(a)    TForce's access to UPS's WorldShip billing and shipping systems was scheduled to expire on May 1, 2024;

(b)    TForce's engineering team had informed senior TFI management that immediately upon cutoff from the WorldShip platform, TForce would lose significant shipping volume;

(c)    TFI had not yet developed, licensed or implemented adequate replacement systems for WorldShip, so TForce would experience a material degradation of its billing and customer ordering systems during the interim period between the cutoff of WorldShip on May 1 and the adoption of new systems by year-end 2024;

(d)      During this interim period, TForce would revert to older, manual systems for billing and shipping used by UPS prior to WorldShip;

(e)      As a result of the foregoing, TForce's volumes would immediately decrease and TForce's positive momentum would be impacted negatively by reversion to outdated technologies until the implementation of new tools around year-end. Thus, TForce's services would not improve, but would degrade, for a period of approximately eight months;

(f)      The statement that "we will be improving our freight billing system . . . by the end of the year" was materially misleading, because it omitted the material fact that TForce's billing and shipping systems would worsen for the remainder of 2024 until the adoption of a modern replacement tool in 2025; and

(g)      The statement that "our services are also improving" was materially misleading, because it omitted the material fact that TForce's services would worsen for the remainder of 2024 due to the exit from WorldShip and would not improve until the adoption of a modern replacement tool in 2025.

73.     During the 1Q24 Earnings Call, an analyst asked about "early innings and service improvements" and "what's next to come to get service." Bédard responded that, top amongst the Company's alleged priorities was its "billing system" that "we are fixing that during the course of '24, finally." Specifically, Bédard stated as follows, as set forth in following colloquy:

Jordan Alliger [Analyst, Goldman Sachs]:

Good morning. I know you mentioned sort of early innings and service improvements, so good to get a little bit more color on what you feel you've accomplished and what's next to come to get service. And then, even though it's early innings, are you at the point in service, again, assuming the freight market cooperates, where you could have sustainability in that growth and tonnage after a first quarter that saw an inflection?

Alain Bédard:

Yeah. Well, we believe so. And, if you look back that an example of stupidity is missed pickup. So, if you don't monitor that, you can't improve. So this is something that we put in place to make sure that we monitor that. Now, we still have about -- around 2% of our pickup that we miss today. Okay? Now, depending on the terminal that, we have better ones, we have ones that are not so good. But, the business of freight starts with the pickup. So if you miss the pickup, you miss the revenue. This is the kind of culture that we are changing, for example, in California, where we can't afford to miss pickup. So we're changing that, and that improves the service to the customer, because then the customer can trust -- can have trust in you that you're going to show up and do the pickup, right? That's number one.

***Number two is our billing system. And I've been saying that for two years, okay? It's also a major issue of having, like, sand in the gearbox with our relation with customers. So we are fixing that during the course of '24, finally***. Okay? And in terms of the linehaul, if you rail your linehaul freight, your freight on the linehaul with rail, I mean, don't expect to be -- don't expect it's going to be on time. I mean, those guys -- their on-time services is maybe not as good as the road. And if you look at my peers in the US, I mean, the percentage of freight that's run on the rail is way less than what we do us today. So this is also something that we are working on to improve, and we can't change everything at the same time, but this is an ongoing process in '24 and into '25.

So, to your question of growing this company, I mean, for sure, right now, what we've been able to do is at least grow the weight per shipment, which is, a key to success. I mean, again, if you compare my average weight per shipment to my peers in the US, I'm still way too low versus those guys. If you look at my weight per shipping in Canada, there we understand the business, and our weight per shipment is way more than what it is in the US. So that is also a trend that we're going to keep running and improving over the course of the next year or two.

So this is why we're probably in the second inning of a nine inning game on that TForce freight LTL business. I mean, we still have to work on the cost, like I said, our P&D, we still run too many miles, our density is not as good as should be, we don't pick up enough freight per stop, et cetera, et cetera. So these are all the different levers that we have to put in place, do what we do in Canada. I mean, we run an OR in Canada that is second to none. If you look at my OR in Canada, sure, it went from 75 okay, last year to 81. But, an 81 OR in Canada in a very depressed market is not bad. Why? Because we have a density that is second to none. And this is what we're trying also to build in the US. Do more with less.

74.    The statements in ¶73 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

(a)    TForce's access to UPS's WorldShip billing and shipping systems was about to expire on May 1, 2024;

(b)    TForce's engineering team had informed senior TFI management that immediately upon cutoff from the WorldShip platform, TForce would lose significant shipping volume;

(c)    TFI had not yet developed, licensed or implemented adequate replacement systems for WorldShip, so TForce would experience a material degradation of its billing and customer ordering systems during the interim period between the cutoff of WorldShip on May 1 and the adoption of new systems by year-end 2024;

(d)    During this interim period, TForce would revert to older, manual systems for billing and shipping used by UPS prior to WorldShip;

(e)    As a result of the foregoing, TForce's volumes would immediately decrease and TForce's positive momentum would be impacted negatively by reversion to outdated technologies until the implementation of new tools around year-end. Thus, TForce's services would not improve, but would degrade, for a period of approximately eight months;

(f)    The statement that problems with TForce's billing system was causing "sand in the gearbox with our relation with customers" was materially misleading because it omitted the fact that TForce's freight billing system would worsen for the remainder

of 2024, thereby creating even more "sand in the gearbox," before improving following the adoption of a modern replacement tool in 2025; and

(g)    The statement that "we are fixing that during the course of '24, finally" was materially misleading because it omitted the fact that TForce's freight billing system would worsen for the remainder of 2024, such that TForce's customer relations would get worse before getting better, and TForce would experience significant customer churn and reduced volume during the course of 2024.

### B.    Statements Related To Second Quarter 2024 Results

75.    On July 25, 2024, TFI filed its 2024 Second Quarter results on a Form 6-K with the SEC (the "2Q24 6-K"). Attached as Exhibit 99.2 to the 2Q24 6-K was the Company's Management Discussion & Analysis for the period ended June 30, 2024 (the "2Q24 MD&A"). The 2Q24 MD&A purported to warn of certain "risks and uncertainties" which "may" or "could" impact the Company, including the following, in relevant part:

> **Acquisitions and Integration Risks**. Historically, acquisitions have been a part of the Company's growth strategy. The Company ***may*** not be able to successfully integrate acquisitions into the Company's business, or ***may*** incur significant unexpected costs in doing so. Further, the process of integrating acquired businesses ***may*** be disruptive to the Company's existing business and may cause an interruption or reduction of the Company's business[.]
>
> *            *            *
>
> Given the nature and size of UPS Freight, as well as the structure of the acquisition as a carveout from UPS, the acquisition of UPS Freight presents the following risks, in addition to risks noted elsewhere in these risk factors:
>
> • a large portion of the business of UPS Freight prior to the acquisition was with affiliates of UPS. While there are transportation service agreements in effect with such affiliates of UPS, such affiliates may decide to reduce or eliminate business with the Company in the future and we have limited contractual protections to prevent the loss of such business;
>
> • ***some of the information and operating systems of UPS Freight were integrated with UPS prior to the acquisition. The Company is in the process of transitioning***

***such systems and could experience disruptions during the transition or difficulty or delay in building its systems and personnel to operate them***;

• the Company had limited experience in the U.S. LTL market prior to the acquisition and we may be unsuccessful in integrating UPS Freight and operating it profitably;

76.    The statements in ¶75 were materially false and/or misleading when made, and/or omitted to state material facts necessary to make the statements not misleading, because:

(a)    The contingent statement that the Company "***could*** experience disruptions during the transition" away from UPS Freight operating systems implied the Company had not yet experienced material disruptions at that time, when in fact the Company had already experienced material disruptions;

(b)    The contingent statement that the Company "***could*** experience . . . difficulty or delay in building its systems" to replace the UPS Freight systems implied the Company had not yet experienced material difficulties or delays in building those systems, when in fact the Company had already experienced material difficulties and delays in building replacement systems;

(c)    The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and (ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1)    TForce's agreement to use UPS's WorldShip billing and shipping systems had already expired;

(2)    Immediately upon the cutoff from WorldShip, TForce had experienced a material decline in volume, just as TForce's engineering team had warned TFI;

(3)    Following the cutoff from WorldShip, TForce had reverted to legacy manual billing and shipping systems, which caused a material degradation of service, missed pickups, a failure to invoice customers, and customer backlash, which further exacerbated the decline in volume; and

(4)    TFI had not yet developed, licensed or implemented adequate replacement systems for WorldShip, so TForce had experienced and would continue to experience a material degradation of its billing and customer ordering systems during the interim period between the cutoff of WorldShip on May 1 and the adoption of new systems by year-end 2024; and

(d)    As a result of the foregoing, the risk had already materialized in substantial part, and the risk of further disruptions, difficulties, and delays was materially higher than Defendants' statements suggested.

77.    Attached as Exhibit 99.4 to the 2Q24 6-K, was a Certification of the interim financial report and interim MD&A signed by Defendant Bédard. The Certification stated that Bédard had "reviewed the interim financial report and interim MD&A." The Certification further stated:

> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, *the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made*, with respect to the period covered by the interim filings.

78.    The statements in ¶77 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons as set forth above in ¶76 with respect to the statements in ¶75. The failure to disclose the material facts identified in ¶76(c)(1)-(4) rendered the 2Q24 MD&A materially misleading and thereby rendered Bédard's Certification of that MD&A materially misleading.

79.     Attached as Exhibit 99.5 to the 2Q24 6-K, was a Certification of the interim financial report and interim MD&A signed by Defendant Saperstein. The Certification stated that Saperstein had "reviewed the interim financial report and interim MD&A." The Certification further stated:

> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, ***the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made***, with respect to the period covered by the interim filings.

80.     The statements in ¶79 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons as set forth above in ¶76 with respect to the statements in ¶75. The failure to disclose the material facts identified in ¶76(c)(1)-(4) rendered the 2Q24 MD&A materially misleading and thereby rendered Saperstein's Certification of that MD&A materially misleading.

### C.      Statements Related To Third Quarter 2024 Results

81.     On October 21, 2024, the Company filed its 2024 Third Quarter results on a Form 6-K with the SEC (the "3Q24 6-K"). Attached as Exhibit 99.2 to the 3Q24 6-K was the Company's Management Discussion & Analysis for the period ended September 30, 2024 (the "3Q24 MD&A"). The 3Q24 MD&A purported to warn of certain "risks and uncertainties" which "may" or "could" impact the Company, including the following, in relevant part:

> **Acquisitions and Integration Risks**. Historically, acquisitions have been a part of the Company's growth strategy. The Company *may* not be able to successfully integrate acquisitions into the Company's business, or *may* incur significant unexpected costs in doing so. Further, the process of integrating acquired businesses *may* be disruptive to the Company's existing business and may cause an interruption or reduction of the Company's business[.]

> *            *            *

Given the nature and size of UPS Freight, as well as the structure of the acquisition as a carveout from UPS, the acquisition of UPS Freight presents the following risks, in addition to risks noted elsewhere in these risk factors:

• a large portion of the business of UPS Freight prior to the acquisition was with affiliates of UPS. While there are transportation service agreements in effect with such affiliates of UPS, such affiliates may decide to reduce or eliminate business with the Company in the future and we have limited contractual protections to prevent the loss of such business;

• *some of the information and operating systems of UPS Freight were integrated with UPS prior to the acquisition. The Company is in the process of transitioning such systems and could experience disruptions during the transition or difficulty or delay in building its systems and personnel to operate them*;

• the Company had limited experience in the U.S. LTL market prior to the acquisition and we may be unsuccessful in integrating UPS Freight and operating it profitably;

82.     The statements in ¶81 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

(a)     The contingent statement that the Company "could experience disruptions during the transition" away from UPS Freight operating systems implied the Company had not yet experienced material disruptions at that time, when in fact the Company had already experienced material disruptions;

(b)     The contingent statement that the Company "could experience . . . difficulty or delay in building its systems" to replace the UPS Freight systems implied the Company had not yet experienced material difficulties or delays in building those systems, when in fact the Company had already experienced material difficulties and delays in building replacement systems;

(c)     The statements were materially misleading because they failed to disclose both (i) significant materializations of the risks that had already occurred and

(ii) concrete facts that materially increased the magnitude and impact of these risks. Specifically, the statements failed to disclose that:

(1) Immediately following the cutoff from WorldShip in May 2024, TForce had experienced a material decline in volume, just as TForce's engineering team had warned TFI.;

(2) Following the cutoff from WorldShip, TForce had reverted to legacy manual billing and shipping systems, which caused a material degradation of service, missed pickups, and customer backlash, which further exacerbated the decline in volume;

(3) The post-WorldShip transition problems deepened during Q3 2024 and Q4 2024, as reflected by the declining financial performance of TFI's LTL segment during this period. Indeed, TFI reported an operating income for its LTL segment of $109.9 million for Q2 2024, $96 million for Q3 2024, and $70.3 million for Q4 2024. Thus, the financial performance of TFI's LTL segment, which was TFI's largest reporting segment, declined significantly during each of the two quarters following the cutoff of WorldShip.[20]

(d) As a result of the foregoing, the risk had already materialized in substantial part, and the risk of further disruptions, difficulties, and delays was materially higher than Defendants' statements suggested.

---

[20] The 3Q24 MD&A was filed on October 21, 2024, three weeks into Q4 2024. Thus, while this disclosure covers the period of Q3 2024, at the time the statement was made, three additional weeks of Q4 2024 had already transpired, and during Q4 2024, the loss of small and medium-sized customers accelerated. *See supra* at ¶¶48-64.

34

83.     Attached as Exhibit 99.4 to the 3Q24 6-K, was a Certification of the interim financial report and interim MD&A signed by Defendant Bédard. The Certification stated that Bédard had "reviewed the interim financial report and interim MD&A." The Certification further stated:

> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, ***the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made***, with respect to the period covered by the interim filings.

84.     The statements in ¶83 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons as set forth above in ¶82 with respect to the statements in ¶81. The failure to disclose the material facts identified in ¶82(c)(1)-(3) rendered the 3Q24 MD&A materially misleading and thereby rendered Bédard's Certification of that MD&A materially misleading.

85.     Attached as Exhibit 99.5 to the 3Q24 6-K, was a Certification of the interim financial report and interim MD&A signed by Defendant Saperstein. The Certification stated that Saperstein had "reviewed the interim financial report and interim MD&A." The Certification further stated:

> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, ***the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made***, with respect to the period covered by the interim filings.

86.     The statements in ¶85 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons as set forth above in ¶82 with respect to the statements in ¶81. The failure to disclose the material facts identified in ¶82(c)(1)-(3) rendered the 3Q24 MD&A materially misleading and thereby rendered Saperstein's Certification of that MD&A materially misleading.

87.    On October 22, 2024, TFI hosted its 3Q24 Earnings Call. During the 3Q24 Earnings Call, Bédard purported to assure investors of the alleged drivers of volume loss and customer churn which impacted the Company within the quarter. Specifically, an analyst asked Bédard to parse out and "distinguish how much of the earnings pressure there is purely cyclical and will snap back with more reordering stuff versus maybe some evolving industry dynamics." In response, Bédard merely stated that "we have to improve our service," identifying missed pickups, claim ratios, and management culture as the areas on which TForce needed to focus. Specifically, Bédard stated, during the 3Q24 Earnings Call, as follows in relevant part:

Ravi Shanker [Analyst, Morgan Stanley]

So obviously interesting times in the industry. *Just on U.S. LTL, are you able to distinguish how much of the earnings pressure there is purely cyclical and will snap back with more reordering stuff versus maybe some evolving industry dynamics* in a post Yellow world with new capacity coming in and players jockeying for share et cetera?

Alain Bédard

That's a difficult question, Ravi. So, our focus is really to improve our cost basis. So the market condition we know has been challenging for the last probably like 18 months. So we don't control market conditions. *Our focus is really to improve our cost base and also improve our service. If you look at the last report from [Mastio], I mean our service according to this survey is the worst of the top 7 carriers in the U.S. So it's really a focus of ours.*

For sure, what we're proposing to our customer is, okay, we proper -- our proposal is good in the sense that, okay, there's a match between the service that we provide, which has to improve, okay. And the rate also is still a good proposal for our customer because our rate on average is much lower than our peers. So this is why our focus was not notwithstanding the market condition. *We have to improve our service, which as a matter of fact, we've started to move more freight away from rail onto the road, but also we have to improve our missed pick up.*

*If you look at our claim ratio, we were going in the right direction but then whoops comes a Q3, we dropped the ball, right? So our claims ratio is at 0.8% of revenue. Our Canadian LTL, our claim ratio is 0.2%, which is like best-in-class. We used to be at 0.4%, 0.5%. Well, now we're at 0.8%. So guys, let's not drop the ball. Let's focus on service. Let's not miss any pick up. Let's be on time with our deliveries, et cetera, et cetera.*

> Now if you look at this purchase that we did three years ago, 3.5 years ago, okay, and you asked me the question, hey, Alain, do you think that you made a mistake with this purchase? Not at all. I mean, the only mistake is that ***we probably underestimated the time it will take us to turn this thing around the culture. Now we're improving the management skill of our guys by training, by providing them financial information that we could continue to improve our cost basis, following metrics of service, et cetera, et cetera***. Things that probably in the past were not a big focus of the management team at the time.

88. The statements in ¶87 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

(a) TForce's exit from the WorldShip platform and failure to replace it with an adequate alternative had caused a substantial decline in shipping volume, customer backlash, and churn, and these factors were the principal drivers of the earnings pressure and loss of volume the analyst had asked about; and

(b) Bédard's identification of general service issues, like missed pickups, claims and management culture, without mentioning the transition from WorldShip and customer dissatisfaction with TForce's reversion to its older shipping and billing systems, presented a materially misleading picture of the reasons why TForce was losing customers, decreasing volume and facing earnings pressure.

89. Further, during the 3Q24 Earnings Call, an analyst asked about the Mastio survey and what things TForce would need to do improve service and costs so that TForce could reach an 85% operating ratio in the U.S. LTL business. Bédard responded by comparing TFI's Canadian management team to its U.S. management team and noting that the Canadian team was performing better, even in a very difficult market, because of their superior training, focus, and management skills. Specifically, Bédard stated, during the 3Q24 Earnings Call, as follows in relevant part:

> Konark Gupta [Analyst, Scotia Capital]

I just wanted to verify on the TForce, Alain. If we look back in the first few years of the acquisition, you started to reprice the book, which happened, decently well. Then you started to optimize the cost. Obviously, and I think you're still kind of looking at the costs here. **I'm just trying to figure out, like, with the [Mastio] survey and obviously, the service focus and the cost focus you have. What's really required here to move the operating ratio in the U.S. LTL business to 85% or so?** I mean, do you need the volumes only or do you need the volume service cost and all those things come together? And how far should we kind of play that road map in the next couple of years?

Alain Bedard

Absolutely. If we would, get from 22 to 25,000 shipments a day, for sure, that would help our cost basis. But the problem that we have within TForce rate today is that our business is too fixed. It's not variable enough, okay? So this is why we have to work with our team, our terminal managers to really adjust on a daily basis our costs versus the volume that we have, okay? That's number 1. And for sure down the road, if we can hit the 23,000, 24,000, 25,000 shipments, for sure that's going to help us.

But you know, this is where it's the chicken and the eggs. ***So if you talk to our sales guy, they say, well you know, it's tough for us to get more business because the service is maybe not up to par to some of our peers, right? So when we talk to our operation guys we got to fix the service. We have to improve the service. Now you say, yes well, if we improve the service, maybe there's a cost to that. No, you have to improve the service and reduce the cost at the same time. So this is quite a challenge and this is where the talent of your management team comes to play.***

***If you look at our management team in Canada, I mean this is a team that's been educated, trained, focused, et cetera for years and years and years. And if you look at the results, okay, in Canada, we're doing very well. Even with the Kindersley acquisition, that was not a star. Okay. I mean our Canadian operation is still running sub 80 OR in a difficult environment. Why? Because we have a very, a very educated talent team to manage our business. And this is the key for us in the U.S., where the terminal management team, lack this training, lack this education. Now they have the tool. Now they have the financial information. So now they have to act according to it so that our cost is less fixed and more variable according to the volume. That's number 1.***

***Number 2, in order to bring our cost down, we need our sales team to understand the mission of trying to get more freight per stop.*** I mean, I've been like preaching that for three years now. And so far, it's like I am preaching to a desert, right? So we haven't done anything good on that. We've done the only thing good we've done with the sales team so far is we moved the average weight per shipment from 1,075 to 1,200.

So we have a little bit more dollars per shipment, okay, that's good. Well, 1,200 is not the optional -- it's not the top where we should be, but at least it's a move in the right direction. But by having more freight per stop, at the same time, okay, you split the cost of that stop over two shipments or three shipments instead of one or two shipments. So that helps you with your cost basis and you become more competitive. So this is a mission that we've been saying and repeating, but it seems to be difficult to accomplish. So this is why we're continuing to educate these guys to go. Our GFP is down like there's no tomorrow. This is a diamond way in TForce rate.

Now for sure, we've lost all the revenue from the reseller because most of these resellers were cheating our partner. So now we have to rebuild that business with our own account. We cannot deal with the reseller that are cheating, okay? Because our partner you know does not accept that anymore, right? So let's have the sales team focus on our growing our GFP and also growing the number of shipment per stop. So that's going to help our cost basis. So it's not just the market that is maybe not the strongest today. Us, we have a lot of work to do ourselves. Okay, ***I mean the market is difficult in Canada. It's probably even more difficult in Canada than in the U.S. And if you look at what we do over there, I mean we do pretty good. Why? Because we've got the real strong management team. This is what we're trying to build in the U.S. right now.***

90.    The statements in ¶89 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

(a)    TForce's exit from the WorldShip platform and failure to replace it with an adequate alternative had caused a substantial decline in shipping volume, customer backlash, and churn in the U.S. LTL market, and these factors were the principal drivers of TForce's poor performance in Q3 2024;

(b)    The key differentiator between TFI's performance in the U.S. LTL market and its performance in the Canadian LTL market during Q3 2024 was TForce's exit from the WorldShip platform and the failure to replace it with an adequate alternative. TFI's Canada business did not face a similar transition from its customer ordering and shipping platforms; and

(c)    Bédard's attribution of the poor performance in the U.S. to the comparative weakness of the U.S. management team, without mentioning the WorldShip transition, presented a materially misleading picture of the reasons for the poorer operational performance in the U.S.

91.    Additionally, during the 3Q24 Earnings Call, an analyst asked Bédard to rank order which headwinds (e.g., service declining or added capacity of competitors) was most responsible for the poor performance of the U.S. LTL segment in Q3 2024.  Bédard responded by emphasizing the role of poor service in driving customer churn at TForce. Specifically, Bédard stated, during the 3Q24 Earnings Call, as follows in relevant part:

Daniel Imbro [Analyst, Stephens]

I wanted to maybe continue on the U.S. LTL pricing discussion. ***You mentioned that obviously one of the headwinds was service stepping back, but also that some of the competitors had added capacity. Can you maybe rank order which of those sequentially worsened through the quarter when you look at maybe the step down from the first half, mid-single to low-singles? And then just curious, as you're talking to customers and you're making these improvements to service, do you think your pricing will have to step further down to get customers to try and come back to TForce again? Or how are those customer conversations going as you navigate the cost for service changes?***

Alain Bedard

Yes. ***So I think that you need the service. This is step 1 to try to convince the customer, right? So you can attract the customer with rates. But if the service is poor, I mean the guy is going to run and he's going to go somewhere else because yes, service is very important.*** Price is very important, number one. But service is also key, right? So when you're trying to get more freight, the guy will say, yes, how is your service? Well, my service is great. Okay, I'll give you a chance. ***And then if you don't provide the right service, then he's going to walk and you're going to have lots of churn. So that's one thing that a TForce rate we have, right? We have too much churn.*** So customers try us, and we fail a bit, okay, the guy goes away. So by improving service, you reduce the churn. By reducing the churn, you improve your volume, right? So this has been key to us.

In terms of our peers the fact that some of our peers invested heavily in real estate. I mean, we haven't seen anything so far. But I'm just saying that the market is really soft. So people are -- some people are trying to chase rate and grow the volume.

Our focus for us is not to chase freight, it's we have to fix our service first and reduce our costs and then reduce the churn so that we start growing organically because if you get 3,000 shipments more a day, but you lose 3,000 because of the churn, well, you're back to zero. ***So you got to fix the service so that you can reduce the churn of customer.***

92. The statements in ¶91 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

(a)   TForce's exit from the WorldShip platform and failure to replace it with an adequate alternative had caused a substantial decline in shipping volume, customer backlash, and churn in the U.S. LTL market, and these factors were the principal drivers of TForce's poor performance in Q3 2024;

(b)   Bédard's emphasis on a generic decline in service as a particular factor in driving customer churn in Q3 2024 was materially misleading, because it failed to identify a much more salient and relevant factor for churn in Q3 2024: the exit from the WorldShip platform and TForce's reversion to outdated shipping and billing systems, which drove customer dissatisfaction, churn, and a material decrease in volume.

93. Finally, during the 3Q24 Earnings Call, an analyst asked why "customers' perception of [TForce's] service level" had not improved from 2023 to 2024 after all the work that TForce had put into improving service. Bédard identified factors including increased claim costs, missed pickups, and a bonus plan that did not properly incentivize TForce workers to improve their performances in those areas. Specifically, Bédard stated, during the 3Q24 Earnings Call, as follows in relevant part:

Ben Moore [Analyst, Citi Group]

Maybe as a follow-up, you've been asked a lot about service and service improvement on this call. Maybe just to ask slightly differently, ***it looks like your customers' perception of your service level is roughly where it was this year and last year, roughly the same, still sort of, unfortunately at the lower range compared to your other public LTLs, where some of them have actually improved from '23 to '24. Why do you think after all the work, very hard work that you and your team has been doing, why hasn't that shown an improvement from '23 to '24?*** And do you think we should see some dramatic improvement on any of those things, the damage, the shortage, the on-time pick ups deliveries from '24 to '25?

Alain Bedard

Yes. Well, like I said earlier on the call, I mean, it's a disappointment to me when you look at the claims where we were heading in the right direction, and then path, I mean, over the last nine months a year. ***Now our claims cost is going in the wrong direction. So guys, let's refocus on that. So that does not help us with the valuation that our customers are doing a bus in terms of service. Claim is a problem, right? Because when you break the guy's stuff, he doesn't like you, right? So that's number one, where we have not improved.*** So this is why we are at the bottom of the pack, number one.

***Number two, if you don't show up for pick up, nobody likes that because then you're stuck with the freight on your dock, right? And then you have to either call someone else or hopefully Q4 ratio is up tomorrow. Customers don't like that, right? So this is under our control, and we have to do a much better job at it. So this is why we have not improved, okay?*** And this is why, like I was saying earlier, there's an evolution in the bonus program that we have with our sales team and our management team. So it shows that the program that we have right now in '24 is not good because we're not getting the result that we're supposed to get, right? ***So we will have to improve the bonus plan so that these guys bonuses aligned to what we want them to perform.***

***So being improved service don't break the stuff, don't lose it, show off or pick up, et cetera, et cetera.*** And then the guys will have to take that seriously because then the incentive, the bonus is gone, right? But that's an evolution because where we were with the bonus system when we bought the company, it was just, I mean, unacceptable, right? ***So it's been an evolution. But I mean this report -- this master report is a major disappointment for me. And I'm going to be with the team tomorrow as a matter of fact, and for sure, we'll be talking about that guys, I mean, we're still at the bottom of the pack. We have not improved.***

94.    The statements in ¶93 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

(a)     Customer perceptions of TForce's service were negatively impacted by problems arising from the WorldShip transition, which caused problems in placing orders, an increase in missed pickups, and billing errors; and

(b)     Bédard's failure to identify the WorldShip transition's role in negatively impacting customer perceptions of TForce's service presented a materially misleading picture of the total mix of factors contributing to negative customer perceptions of TForce's service.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

95.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TFI, their control over, and/or receipt and/or modification of TFI's allegedly material misstatements and/or their associations with the Company that made them privy to confidential and/or proprietary information concerning TFI, participated in the fraudulent scheme alleged herein.

96.     The Individual Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicit or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

97. The fraud alleged herein relating to concealing the Company's TForce technology transition and drivers of significant volume loss involved TFI's "core operations," and knowledge of the fraud may therefore be imputed to the Individual Defendants.

### A. Corporate Scienter Allegations

98. The Company is liable for the acts of the Individual Defendants and other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

99. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior,* and agency principles.

100. Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to TFI as an entity. The following individuals are management-level employees whose knowledge can be imputed to the Company for the purposes of determining corporate scienter.

### 1. Bob McGonigal

101. McGonigal served as an Executive Vice President at TFI beginning in 2016. According to the Company's Fiscal 2023 Second Quarter Earnings Call, in 2024, McGonigal took over responsibility for the Company's U.S. LTL operations, working alongside TForce Freight President Keith Hall.

102. According to FE2, McGonigal reported directly to Bédard.

103. According to FE1, McGonigal was present at weekly meetings with FE1, where, starting in November 2023, FE1 routinely shared slides which reported the percentage of volume attributable to freight from WorldShip. According to FE1, FE1 presented data, in meetings were

McGonigal was present, that showed TForce would see significant (meaning greater than 5%), freight volume declines from the termination of WorldShip integration following the UPS cutoff on May 1, 2024.

104.    McGonigal's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

### 2.    Norman Brazeau

105.    Norman Brazeau ("Brazeau") currently serves as Vice President of Real Estate at TFI, a position he has held since 2021.

106.    According to FE1, within the relevant period, FE1 attended monthly meetings with senior management, including Brazeau. According to FE1, during those meetings, WorldShip was discussed.

107.    Brazeau's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

### 3.    Rick Hashie

108.    Rick Hashie ("Hashie") serves as the Senior Executive Vice-President overseeing TFI's North American Logistics segment, a position he has held since May, 2025. Prior to that, Hashie served as TFI's Executive Vice President of LTL and North America from 2017 to April, 2025.

109.    According to FE1, within the relevant period, FE1 attended monthly meetings with senior management, including Hashie. According to FE1, during those meetings, WorldShip was discussed.

110.    Hashie's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

### 4.    Chris Traikos

111.    Chris Traikos ("Traikos") serves as a TFI Executive Vice-President, a position he has held since 2022. In his position, he oversees several LTL business units.

112.    According to FE1, within the relevant period, FE1 attended monthly meetings with senior management, including Traikos. According to FE1, during those meetings, WorldShip was discussed.

113.    Traikos's knowledge and scienter can be imputed to the Company under the corporate scienter doctrine, respondeat superior, and agency principles.

### B.    Defendants' Access To Information And Core Operations

114.    The Individual Defendants' scienter is also established because the alleged misstatements and omissions at issue here concerned TFI's core operations. According to the Company's annual information form for the fiscal year ended December 31, 2024, 44% of the Company's revenue was attributable to the LTL segment, and the LTL segment was the Company's single largest single contributor to TFI's revenue mix. TForce represents a substantial portion of the Company's LTL segment revenue. The Company's ability to maintain LTL volume was therefore key to the Company's ability to maintain revenue.

115.    The Individual Defendants' scienter is further supported by the fact that the Company, at all relevant times, was focused the manner in which technology was impacting the ability of TForce to perform and execute. For example, during the Company's second quarter 2024 earnings call, Bédard emphasized that "for us, our focus at TForce Freight is really, really to be more lean and mean, to be more efficient. For sure, *we are implementing new technology within this company in terms of line-haul, in terms of billing, master file and all that*."

116.    The Individual Defendants' scienter is further supported by the fact that the Company, at all relevant times, was focused on the details of freight characteristics in order to

maintain and grow LTL volume. For example, in the Company's second quarter 2024 earnings call, Bédard emphasized that the Company is "*focused on the details, including quality of service that drives volumes.* We are focused on freight quality, maximizing weight and revenue per shipment and always striving for cost management through greater efficiencies." In the same call, Bédard again emphasized that it "*is so important that our focus for us is to keep what we've got in terms of volume, try to improve it, try to grow it slowly.*"

117.    The Individual Defendants' scienter is further supported by the fact that the Individual Defendants were heavily involved in the Company's LTL operations and kept apprised about the day-to-day operations, including volume. Bédard told investors on the Company's third quarter 2024 earnings call, when discussing TForce Freight pricing rates, that senior management is deeply involved in operations to the extent that it is involved in making daily adjudgments to pricing based on volume. Specifically, during that earnings call, Bédard stated: "we have to work with our team, our terminal managers to really adjust on a daily basis our costs versus the volume that we have, okay? That's number 1." Moreover, during that earnings call, Bédard remarked on how he is kept apprised of the causes and drivers of volume loss, misleadingly stating that "the start of October was a little bit depressed in terms of volume. And the reason being is that we had issues in the Carolinas. We had issues in Georgia. We had some issues in Florida, et cetera, et cetera."

118.    Information as to TFI's WorldShip freight volume enabled the Individual Defendants to assess whether the impending cutoff would resulting in volume loss, so they knew or should have known of the outsized impact of the UPS technology integration cutoff to the fiscal 2024 financial results.

## VII.    LOSS CAUSATION

119.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

120.    Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of TFI's securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Plaintiff and the other members of the Class would not have purchased TFI securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed risks materialized, the price of TFI shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of TFI securities during the Class Period, Plaintiff and other members of the Class suffered economic losses, i.e., damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negate any inference that the economic losses and damages suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

121.    As detailed supra, the truth regarding the Company's volume loss and loss of small and medium sized customers was partially revealed, and/or the concealed risks materialized, after the close of market on February 19, 2025 and before the market opened on February 20, 2025. As a direct result of these disclosures, the price of TFI's stock declined significantly, precipitously, thereby damaging investors as the artificial inflation in TFI's stock price was removed.

122.    On February 19, 2025, after the market closed, TFI announced its fourth quarter and full year 2024 financial results in a press release, revealing losses which shocked investors: net income had declined 33% year-over-year in the quarter and over 16% year-over-year for the

fiscal year; and earnings per share had declined over 32% year-over-year in the quarter and 14.5% year-over-year for the fiscal year. Further, the Company's largest single contributor to its revenue, LTL segment, was down 33% year-over-year in the quarter and 15% year-over-year for the fiscal year in operating income; and 9% year-over-year in the quarter and nearly 5% year-over-year for the fiscal year in revenue (before fuel surcharge).

123.    On February 20, 2025, before the market opened TFI held a conference call in connection with these financial results. During the call, Defendant Bédard revealed that the Company is "losing the small and medium-sized . . . customers, which have the best margin" and this "really accelerated in Q4." Bédard further admitted "We're getting also killed because our volume keeps dropping. Our shipment count is down 6% year-over-year." Bédard concluded "The volumes are not there. So it's going to be a difficult '25" "our volume, okay, keeps coming down, right? So it's like you're chasing your tail, like a dog chasing his tail, okay?"

124.    On this news, TFI's stock price fell $26.13, or 20.5%, to close at $101.48 per share on February 20, 2025, on unusually heavy trading volume.

## VIII.  CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired TFI common stock between April 26, 2024 and February 19, 2025, inclusive, on a U.S. exchange (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

126.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TFI's shares actively traded on the NYSE. While the

exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of TFI shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by TFI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

127.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

129.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of TFI; and

c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

130.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    UNDISCLOSED ADVERSE FACTS

131.    The market for TFI's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, TFI's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired TFI's securities relying upon the integrity of the market price of the Company's securities and market information relating to TFI, and have been damaged thereby.

132.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of TFI's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about TFI's business, operations, and prospects as alleged herein.

133.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about TFI's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or

misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE

134.    The market for TFI's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, TFI's securities traded at artificially inflated prices during the Class Period. On July 16, 2024, the Company's share price closed at a Class Period high of $158.55 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of TFI's securities and market information relating to TFI, and have been damaged thereby.

135.    During the Class Period, the artificial inflation of TFI's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about TFI's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of TFI and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

136.    At all relevant times, the market for TFI's securities was an efficient market for the following reasons, among others:

(a)     TFI shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, TFI filed periodic public reports with the SEC and/or the NYSE;

(c)     TFI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     TFI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

137.   As a result of the foregoing, the market for TFI's securities promptly digested current information regarding TFI from all publicly available sources and reflected such information in TFI's share price. Under these circumstances, all purchasers of TFI's securities during the Class Period suffered similar injury through their purchase of TFI's securities at artificially inflated prices and a presumption of reliance applies.

138.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to

recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

139.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

140.    The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of TFI who knew that the statement was false when made, and/or the statement lacked a reasonable basis.

## XII.  CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

141.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

142.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase TFI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

143.    Defendants (i) employed devices, schemes, and artifices to defraud; and/or (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for TFI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Any one of which is sufficient for Plaintiff to state a claim, and Plaintiff expressly alleges violations under all three sections of Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

144.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about TFI's financial well-being and prospects, as specified herein.

145.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TFI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about TFI and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

146.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

147.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing TFI's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

148.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of TFI's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired TFI's securities during the Class Period at artificially high prices and were damaged thereby.

149.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

TFI was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their TFI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

150.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

151.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

152.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

153.     Individual Defendants acted as controlling persons of TFI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

154.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

155.    As set forth above, TFI and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 24, 2025                    By:    *Gregory B. Linkh*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
Rebecca Dawson
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com
rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Patricia Douglass and Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

**PROOF OF SERVICE**

I hereby certify that on this 24th day of October, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<div align="right">
s/ <em>Gregory B. Linkh</em><br>
Gregory B. Linkh
</div>