UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BARRETT BROWNBRIDGE, *individually and on behalf of all others similarly situated*,

Plaintiff,

– *against* –

TFI INTERNATIONAL INC., ALAIN BÉDARD, *and* DAVID SAPERSTEIN,

Defendants.

**OPINION & ORDER**

25-cv-02159 (ER)

RAMOS, D.J.:

Barrett Brownbridge brought this class action against TFI International Inc. ("TFI"), along with its chief executive officer, Alain Bédard, and chief financial officer, David Saperstein (the "individual defendants," and together with TFI, "the defendants"). The operative complaint[1] asserts claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. In their complaint, the plaintiffs allege that TFI—a transportation and logistics company—failed to disclose its loss of access to a third-party shipping and billing platform, WorldShip, or that its transition from WorldShip would result in a sudden, sharp loss of volume from customers who used the platform. Doc. 21 ¶ 4. The complaint also alleges that, after the WorldShip cutoff occurred, the defendants concealed the role that it played in contributing to the company's poor performance. *Id.* Before the Court is the defendants' motion to dismiss the complaint for failure to state a claim. Doc. 24. For the reasons set forth below, the motion is GRANTED.

[1] The operative complaint is the first amended complaint. Doc. 21. For brevity, the Court will refer to it simply as the complaint.

## I. BACKGROUND[2]

### A. The Parties

TFI was founded as a regional trucking service in Quebec, Canada in 1957. Doc. 21 ¶ 25.[3] Through a series of strategic acquisitions, it expanded its operations to include substantial business in the United States.[4] Bédard has served as TFI's chief executive officer, president, and chairman since 1996. *Id.* ¶ 14. In 2018, Saperstein was named TFI's chief financial officer. *Id.* ¶ 16.

### B. The UPS Freight Acquisition

TFI announced that it had entered an agreement with United Parcel Service ("UPS") to acquire UPS's less-than-truckload ("LTL")[5] and dedicated truckload ("TL")[6] divisions (collectively, "UPS Freight") in January 2021. *Id.* ¶ 27. At the time, TFI indicated that the acquisition would significantly broaden its North American LTL footprint and create what TFI "believe[d] to be North America's single most comprehensive LTL network." *Id.* Under the agreement, TFI would operate UPS Freight independently within its existing LTL business segment under the new brand name TForce Freight ("TForce"). *Id.* ¶¶ 28, 32. UPS also agreed to allow TFI to continue to use its suite of freight-related shipping software for a transitional period. *Id.* ¶ 29. This software included a desktop shipping application called WorldShip, which allows shippers to prepare labels, transmit shipment information, schedule pickups, and integrate data with UPS's systems. *Id.* ¶¶ 29–30. It also included other shipping applications, like

---

[2] The background is drawn from the well-pleaded factual allegations in the complaint, Doc. 21, which, for the purposes of this motion, the Court accepts as true. *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 173 (2d Cir. 2012).

[3] Citations to the complaint refer to the relevant paragraph numbers. Citations to the briefs or other documents refer to the page numbers generated by ECF.

[4] In 2025, approximately 70% of TFI's business arose from the U.S. domestic market. Doc. 21 ¶ 25.

[5] "The LTL business focuses on shipments too small to fill an entire truck. It handles the pickup, consolidation, transportation, and delivery of smaller freight loads across regional and national networks." *Id.* ¶ 2 n.1.

[6] The TL business "provides full-truckload transportation services, moving entire shipments directly from origin to destination for a single customer, often using specialized or dedicated equipment and offering services such as expedited, flatbed, tank, and container transport." *Id.* ¶ 27 n.4.

UPS CampusShip, the UPS website, and the UPS Shipping application programming interface ("API"), which connects customers directly to shipping solutions through various e-commerce platforms. *Id.* ¶ 30. Certain of these tools, including WorldShip, would only be available until May 1, 2024. *Id.* ¶ 35.

The transaction closed on April 30, 2021. *Id.* ¶ 32. In the quarter that followed, TFI reported significant increases in revenues from its LTL segment. *Id.* ¶ 33. Indeed, TForce alone generated $481 million in the two months after the acquisition. *Id.* In addition, from fiscal year 2021 to 2022, TFI's U.S. LTL revenue increased by 37.9%. *Id.* ¶ 34.

### C. The WorldShip Cutoff

#### *1. The Lead-Up to the WorldShip Cutoff*

The complaint alleges that, as the WorldShip transition date approached, employees warned TFI senior management that the cutoff would lead to a sharp decline in volume. *Id.* ¶ 35. In support of this contention, the complaint offers various allegations from confidential witnesses. Principal among these confidential witnesses is TForce's vice president of engineering from November 2022 to August 2024 ("CW1"). *Id.* ¶ 36. CW1 reported to TForce's president, Keith Hall, and Hall reported directly to Bédard. *Id.* However, according to CW1, there was also a "very clear dotted line" reporting relationship between Hall and TFI's executive vice president of U.S. LTL operations, Bob McGonigal, such that "everything passed through" McGonigal. *Id.*

One of CW1's primary responsibilities was to analyze TForce's shipping volume and how that volume was generated. *Id.* ¶ 38. According to CW1, there were various ways that a shipping order could be initiated,[7] and of those methods, WorldShip accounted for approximately 10% of TForce's volume. *Id.* ¶ 39. During weekly staff

---

[7] These included, but were not limited to, "calls placed to a TForce service center, calls placed to TForce's 1-800 customer service number, WBU (a UPS website), EDI (electronic data interchange), APIs, WorldShip, and handheld devices used by delivery drivers called a DIAD (delivery information acquisition device)." *Id.* ¶ 39.

calls that Hall and McGonigal attended, CW1 presented a slide deck that summarized engineering division projects, deadlines, and updates. *Id.* ¶¶ 37, 40. In November 2023, CW1 started, on a bi-weekly basis, to include a slide in this deck that noted the various sources that contributed to TForce's volume, including WorldShip. *Id.* ¶ 40. CW1 also presented data that showed that TForce would experience "significant" declines in freight volume after the WorldShip transition, which the complaint defines as a "greater than 5%." *Id.* ¶ 103.

When, in the lead-up to the cutoff, CW1 noticed that the share of volume that was attributable to WorldShip was not decreasing, he began to raise concerns about the WorldShip transition at the weekly staff meeting. *Id.* ¶¶ 38–41, 44. For example, CW1 asked if there was a "strategy" for "transitioning [TForce's] customers," to which the sales team responded, "yup, we got it; not a concern." *Id.* ¶ 41. He also asked, "What's going on here?" and "Why are we not moving on this?" to his "partners on the executive staff." *Id.* ¶¶ 41, 44. CW1 recalls that, on one occasion, the director of sales operations or a member of his team told him, "Your analysis of data is correct, and it looks like there will be a volume loss, day one [following the cutoff from WorldShip]." *Id.* ¶ 42. According to CW1, this same team was responsible for developing a plan to avoid loss of volume from the WorldShip cutoff. *Id.* CW1 also alleges that he raised concerns about the volume loss that would result from the WorldShip cutoff during a meeting at TForce's headquarters. *Id.* ¶ 43. However, according to CW1, Hall interrupted him and stated, "We've heard you talk about this a few times. Let's table this, and talk about this with" TForce's vice president of U.S. sales and specialty markets and vice president of pricing and customer experience. *Id.* ¶ 43 & n.12. And two weeks before the cutoff date, CW1 offered during the weekly staff call to dedicate his staff to assist with the transition, because "to [him]," it was "mission-critical, to not lose [the WorldShip] volume" to avoid "another layoff." *Id.* ¶¶ 44–45. McGonigal and Hall did not take him up on his offer. *Id.* ¶ 45.

To support the complaint's allegation that the impact of the WorldShip cutoff was "well understood," the plaintiffs also offer allegations from two additional confidential witnesses. *Id.* ¶ 46. In particular, the complaint alleges that, according to a regional sales director at TForce ("CW2") who participated in the weekly sales calls:

> We all knew it, internally . . . . all of us knew it was going to be a problem. . . . We knew we had three years to come off of it, and they talked about it and talked about it, but it never got traction. And we talked about it with the vice president of sales.

*Id.* ¶ 46. A sales account executive ("CW5")[8] also described the leadup to the UPS service cutoff date as "the messiest divorce I've ever seen of a company." *Id.* ¶ 47.

2. *The Impact of the WorldShip Cutoff*

The complaint also alleges that, after the WorldShip cutoff on May 1, 2024, "TForce experienced a significant operational disruption." *Id.* ¶ 49. In support of this contention, the complaint relies again on allegations from confidential witnesses.[9]

For example, CW1 alleges that he was "freaking out, personally" because on "day one" of the transition, there was a "significant volume loss." *Id.* CW1 also alleges that he was "asking why this happened" and "how this happened," but was "not getting anything" in response, including from Hall. *Id.*

CW2 also alleged that in June or July of 2024, "business" "across all segments" started to experience a "dramatic drop" and that "a lot of [the decline] had to do with internal tech issues." *Id.* ¶ 50. He further alleged that, when TForce "completely" "came off of the UPS technology in June of 2024," "the problems started getting exponentially worse" because "[e]verything" transitioned to TForce's existing technology, which had a

---

[8] The confidential witnesses are not presented in sequential order because the Court uses the same identifying numbers as the complaint.

[9] As evidence of WorldShip's operational impact, the complaint also alleges that, in an independent survey of customer satisfaction, loyalty, and value perceptions among shippers who used freight carriers during the period June through September 2024 performed by Mastio & Company, TForce ranked last among the 23 ranked carriers. *Id.* ¶ 55. (There were 141 carriers that were not ranked because the survey did not collect sufficient data to evaluate them. *Id.*) The complaint does not allege whether this ranking represents a decline from previous years or if the survey attributed TForce's ranking to any particular issue.

"lot of bugs in it" and required that data "be entered manually." *Id.* A sales account executive ("CW3") further alleged that when the company "let people know in May or July of 2024, that [they] were taking people off the WorldShip platform," and that "[w]hen that happened, revenue dropped across the country." *Id.* ¶ 51. CW3 also discussed customer loss and service issues with TForce's director of sales, Lucas Ward—who reported to TForce's vice president of sales for North America, Dean Mills—and a business manager named Benjamin Guilford. *Id.* Another sales account executive ("CW6") stated that TForce "had a problem detaching from the UPS software" because the technology "was completely intertwined." *Id.* ¶ 52. According to CW6, "[w]hen [TForce] tried to move away completely from UPS, that's when [TForce] started having issues," including "backlash" for "missing pickups" from "small market business customers." *Id.*

**D. TFI's Fourth Quarter Performance**

After the market closed on February 19, 2025, TFI announced in a press release that its:

- Net income had declined 33% year-over-year in the fourth quarter and more than 16% year-over-year for the full year,
- Earnings per share had declined more than 32% year-over-year in the fourth quarter and 14.5% year-over-year for the full year,
- Operating income from the LTL segment had declined 33% year-over-year in the fourth quarter and 15% year-over-year for the fiscal year, and
- Revenue from the LTL segment had declined 9% year-over-year in the fourth quarter and nearly 5% year-over-year for the fiscal year, excluding fuel surcharge revenue.

*Id.* ¶ 59. Before the market opened the next day, TFI held a conference call regarding these financial results. *Id.* ¶ 60. There, Bédard explained that TFI was "losing the small and medium-sized . . . customers, which have the best margin"; that this trend "really accelerated in Q4"; and that the company was "also [getting] killed because [its] volume keeps dropping." *Id.* Bédard also warned that it was "going to be a difficult '25" because

the "volumes were not there" and "keep[] coming down." *Id.* By market close that day, TFI's stock price had fallen 20.5% to $101.48 per share, amid unusually heavy trading volume. *Id.* ¶ 61.

According to CW2, the "biggest reason" for the loss of small and medium-sized customers that Bédard described was the transition from WorldShip—which was "basically built for middle-market customers"—to TForce's website, which "was not a good alternative solution." *Id.* ¶ 62. A regional director of sales ("CW4") also affirmed that TForce "lost some mid-market or smaller business, which are typically profitable," when it was cut off from WorldShip. *Id.* ¶ 63. And CW5 alleged that the "complete separation of TForce from WorldShip . . . created a problem with customer loyalty." *Id.* ¶ 64.

**E. The Alleged Misstatements**

The complaint alleges that the defendants are liable for securities fraud because "in the lead up to [the WorldShip] cutoff, [they] failed to disclose that the termination of the WorldShip integration would lead to a sudden, sharp volume loss, as customers who previously scheduled pickups with TFI through WorldShip could no longer do so using that platform," and after the WorldShip cutoff, they "continued to withhold vital information about the significant effects the discontinuance of the UPS WorldShip integration had caused." *Id.* ¶ 4. In support of these claims, the complaint focuses on three categories of statements: (1) Bédard's statements during TFI's earnings call for the first quarter of 2024 ("1Q24"), (2) Bédard's statements during TFI's earnings call for the third quarter of 2024 ("3Q24"), and (3) the risk warnings in TFI's Forms 6-K to the SEC for the first three quarters of 2024, along with Bédard's and Saperstein's accompanying certifications.

*1. 1Q24 Earnings Call*

TFI hosted its 1Q24 earnings call on April 26, 204. *Id.* ¶ 71. During that call, an analyst noted that TForce appeared to have experienced "some nice movement in yields

and volume" and asked whether TForce could "continue" that "momentum" given the "backdrop" of a "freight recession" in the "broader U.S. freight market." *Id.* Bédard responded:[10]

> Well, you see, Brian, we've been educating our sales team to bring freight that fits the model, right? So we've been saying, guys, don't bring us freight that average weight is 1,075 pound per shipment like it was. So finally, for—I mean, don't forget we bought this company three years ago, right, in May. So it took us, let's say, two years just to try to convince these guys that, because you're paid by the weight, why would you haul light shipment? I mean, this is stupid, right? But it change – it takes a long time to change this mentality. The pricing also was bad, okay? And that puts us in a very non-competitive when the shipments were heavy. So we've—we had to change that. We had to change the culture. We have to change a lot of things. Now, we're not done. Because we still drive too many miles between each and every stop. That kills our density compared to what we have in Canada.
>
> We still don't pick up enough freight per sub, okay? So this is also part of the major improvement that we need to happen for TForce freight to come into an 85, 80—80% to 85% operating ratio down the road, right? So the job is not done.
>
> Now, for sure, we understand that the freight environment, even in the LTL, is soft, right? Our focus right now is, like we just said on these three factors, weight, okay, density, etcetera, etcetera. But also at the same time, we are working hard, very hard at reducing the cost. We say that the tiger is always the last one to survive in the jungle. And at TForce Freight today, I mean, *we're a bunch of fat cows, okay? We are way too fat. We have too many clerks. We have too many because our technology is so old, okay, that it takes an army of people to service our customer. And this is something that is ongoing right now.* Okay?
>
> So as an example, *we will be improving our freight billing system, our master file, okay, by the end of the year, which is causing us a lot of problem right now with billing our customers, right? We have too many issues with that and we have too many people at the same time. So this new tool that's supposed to be implemented by year-end is going to help us with that. Our new tool on the linehaul, because one of the reason that we're going to be doing better is our services are also improving.* So missed pickup is improving. We

[10] All of Bédard's oral statements cited herein are correctly quoted from the complaint. The Court has not edited his statements.

> put more freight on the road, okay, versus, let's say, a year ago, the linehaul, we use less rail. Okay? So rail used to be a big portion of our linehaul. Now the portion of rail is reducing, and our own linehaul is picking up speed. So I think that pretty soon we're going to be doing probably like 60% of the linehaul miles will be our own guys, let's say within a year or two, so—in order to, again, improve service.
>
> So to me, Brian, I mean, we still have a lot of work to do over there, but we know what to do. That's the—the beauty is we have to execute and we're just starting to see a little bit of improvement of our execution.

*Id.* (emphasis in original).

During the same call, another analyst asked Bédard for "little bit more color on what [he] feel[s] [TFI has] accomplished and what's next to come to get service" and whether, "even though it's early innings," TFI is "at the point in service"—"assuming the freight market cooperates"—"where [TFI] could have sustainability in that growth and tonnage after a first quarter that saw an inflection." *Id.* ¶ 73. Bédard responded:

> Yeah. Well, we believe so. And, if you look back that an example of stupidity is missed pickup. So, if you don't monitor that, you can't improve. So this is something that we put in place to make sure that we monitor that. Now, we still have about—around 2% of our pickup that we miss today. Okay? Now, depending on the terminal that, we have better ones, we have ones that are not so good. But, the business of freight starts with the pickup. So if you miss the pickup, you miss the revenue. This is the kind of culture that we are changing, for example, in California, where we can't afford to miss pickup. So we're changing that, and that improves the service to the customer, because then the customer can trust—can have trust in you that you're going to show up and do the pickup, right? That's number one.
>
> *Number two is our billing system. And I've been saying that for two years, okay? It's also a major issue of having, like, sand in the gearbox with our relation with customers. So we are fixing that during the course of '24, finally.* Okay? And in terms of the linehaul, if you rail your linehaul freight, your freight on the linehaul with rail, I mean, don't expect to be—don't expect it's going to be on time. I mean, those guys—their on-time services is maybe not as good as the road. And if you look at my peers in the US, I mean, the percentage of freight that's run on the rail is way less than what we do us today. So this is also something that we are working on to

> improve, and we can't change everything at the same time, but this is an ongoing process in '24 and into '25.
>
> So, to your question of growing this company, I mean, for sure, right now, what we've been able to do is at least grow the weight per shipment, which is, a key to success. I mean, again, if you compare my average weight per shipment to my peers in the US, I'm still way too low versus those guys. If you look at my weight per shipping in Canada, there we understand the business, and our weight per shipment is way more than what it is in the US. So that is also a trend that we're going to keep running and improving over the course of the next year or two.
>
> So this is why we're probably in the second inning of a nine inning game on that TForce freight LTL business. I mean, we still have to work on the cost, like I said, our P&D, we still run too many miles, our density is not as good as should be, we don't pick up enough freight per stop, et cetera, et cetera. So these are all the different levers that we have to put in place, do what we do in Canada. I mean, we run an [operating ratio ("OR")] in Canada that is second to none. If you look at my OR in Canada, sure, it went from 75 okay, last year to 81. But, an 81 OR in Canada in a very depressed market is not bad. Why? Because we have a density that is second to none. And this is what we're trying also to build in the US. Do more with less.

*Id.* (emphasis in original).

The complaint alleges that both of these responses[11] were materially misleading because they failed to disclose that: TForce's access to WorldShip was set to expire on May 1, 2024; TForce's engineering team had informed senior TFI management that TForce would lose significant shipping volume immediately upon the cutoff from the WorldShip platform; TFI had not implemented an adequate replacement system for WorldShip, and thus would experience a material degradation of its billing and ordering systems between the WorldShip cutoff and the adoption of new systems by the end of 2024; TFI would revert to older, manual systems during this interim period; and, because

[11] The complaint focuses, in particular, on Bédard's statements that:

- "[W]e will be improving our freight billing system . . . by the end of the year,"
- "[O]ur services are also improving,"
- TForce's billing system was causing "sand in the gearbox with our relation with customers," and
- "[W]e are fixing [TForce's billing system] during the course of '24, finally." Doc. 21 ¶¶ 72, 74.

of the foregoing, TForce's volumes and positive momentum would be negatively impacted until the implementation of the new systems by year-end. *Id.* ¶¶ 72, 74.

*2. 3Q24 Earnings Call*

TFI hosted its 3Q24 earnings call on October 22, 2024. *Id.* ¶ 87. The complaint alleges that Bédard made four materially misleading statements during that call.

The first statement was in response to question from an analyst about whether Bédard was "able to distinguish how much of the earnings pressure [on U.S. LTL] is purely cyclical and will snap back with more reordering stuff" as opposed to being caused by "some evolving industry dynamics," like "new capacity coming in and players jockeying for share." *Id.* Bédard replied:

> That's a difficult question, Ravi. So, our focus is really to improve our cost basis. So the market condition we know has been challenging for the last probably like 18 months. So we don't control market conditions. *Our focus is really to improve our cost base and also improve our service. If you look at the last report from [Mastio], I mean our service according to this survey is the worst of the top 7 carriers in the U.S. So it's really a focus of ours.*
>
> For sure, what we're proposing to our customer is, okay, we proper —our proposal is good in the sense that, okay, there's a match between the service that we provide, which has to improve, okay. And the rate also is still a good proposal for our customer because our rate on average is much lower than our peers. So this is why our focus was not notwithstanding the market condition. *We have to improve our service, which as a matter of fact, we've started to move more freight away from rail onto the road, but also we have to improve our missed pick up.*
>
> *If you look at our claim ratio, we were going in the right direction but then whoops comes a Q3, we dropped the ball, right? So our claims ratio is at 0.8% of revenue. Our Canadian LTL, our claim ratio is 0.2%, which is like best-in-class. We used to be at 0.4%, 0.5%. Well, now we're at 0.8%. So guys, let's not drop the ball. Let's focus on service. Let's not miss any pick up. Let's be on time with our deliveries, et cetera, et cetera.*
>
> Now if you look at this purchase that we did three years ago, 3.5 years ago, okay, and you asked me the question, hey, Alain, do you think that you made a mistake with this purchase? Not at all. I mean, the only mistake is that *we probably underestimated the time it will take us to turn this thing around the culture. Now we're*

> *improving the management skill of our guys by training, by providing them financial information that we could continue to improve our cost basis, following metrics of service, et cetera, et cetera.* Things that probably in the past were not a big focus of the management team at the time.

*Id.* (emphasis in original).

Another analyst then asked, given the Mastio survey and TForce's service and cost focus: what was "really required . . . to move the operating ratio in the U.S. LTL business to 85% or so"; whether TForce "need[ed] the volume only" or "need[ed] the volume[,] service[,] cost[,] and all those things [to] come together"; and "how far should we kind of play that road map in the next couple of years." *Id.* Bédard responded:

> Absolutely. If we would, get from 22 to 25,000 shipments a day, for sure, that would help our cost basis. But the problem that we have within TForce rate today is that our business is too fixed. It's not variable enough, okay? So this is why we have to work with our team, our terminal managers to really adjust on a daily basis our costs versus the volume that we have, okay? That's number 1. And for sure down the road, if we can hit the 23,000, 24,000, 25,000 shipments, for sure that's going to help us.
>
> But you know, this is where it's the chicken and the eggs. *So if you talk to our sales guy, they say, well you know, it's tough for us to get more business because the service is maybe not up to par to some of our peers, right? So when we talk to our operation guys we got to fix the service. We have to improve the service. Now you say, yes well, if we improve the service, maybe there's a cost to that. No, you have to improve the service and reduce the cost at the same time. So this is quite a challenge and this is where the talent of your management team comes to play.*
>
> *If you look at our management team in Canada, I mean this is a team that's been educated, trained, focused, et cetera for years and years and years. And if you look at the results, okay, in Canada, we're doing very well. Even with the Kindersley acquisition, that was not a star. Okay. I mean our Canadian operation is still running sub 80 OR in a difficult environment. Why? Because we have a very, a very educated talent team to manage our business. And this is the key for us in the U.S., where the terminal management team, lack this training, lack this education. Now they have the tool. Now they have the financial information. So now they have to act according to it so that our cost is less fixed and more variable according to the volume. That's number 1.*

> *Number 2, in order to bring our cost down, we need our sales team to understand the mission of trying to get more freight per stop.* I mean, I've been like preaching that for three years now. And so far, it's like I am preaching to a desert, right? So we haven't done anything good on that. We've done the only thing good we've done with the sales team so far is we moved the average weight per shipment from 1,075 to 1,200.
>
> So we have a little bit more dollars per shipment, okay, that's good. Well, 1,200 is not the optional—it's not the top where we should be, but at least it's a move in the right direction. But by having more freight per stop, at the same time, okay, you split the cost of that stop over two shipments or three shipments instead of one or two shipments. So that helps you with your cost basis and you become more competitive. So this is a mission that we've been saying and repeating, but it seems to be difficult to accomplish. So this is why we're continuing to educate these guys to go. Our [Ground Freight Pricing ("GFP")] is down like there's no tomorrow. This is a diamond way in TForce rate.
>
> Now for sure, we've lost all the revenue from the reseller because most of these resellers were cheating our partner. So now we have to rebuild that business with our own account. We cannot deal with the reseller that are cheating, okay? Because our partner you know does not accept that anymore, right? So let's have the sales team focus on our growing our GFP and also growing the number of shipment per stop. So that's going to help our cost basis. So it's not just the market that is maybe not the strongest today. Us, we have a lot of work to do ourselves. Okay, *I mean the market is difficult in Canada. It's probably even more difficult in Canada than in the U.S. And if you look at what we do over there, I mean we do pretty good. Why? Because we've got the real strong management team. This is what we're trying to build in the U.S. right now.*

*Id.* (emphasis in original).

During the same call, another analyst asked to "continue on the U.S. LTL pricing discussion." *Id.* ¶ 91. After noting that Bédard had "mentioned that obviously one of the headwinds was service stepping back, but also that some of the competitors had added capacity," the analyst asked Bédard to "rank order which of those sequentially worsened through the quarter when you look at maybe the step down from the first half, mid-single to low-singles." *Id.* The analyst then asked, "[A]s you're talking to customers and you're making these improvements to service, do you think your pricing will have to step further

down to get customers to try and come back to TForce again? Or how are those customer conversations going as you navigate the cost for service changes?" *Id.* Bédard replied:

> Yes. *So I think that you need the service. This is step 1 to try to convince the customer, right? So you can attract the customer with rates. But if the service is poor, I mean the guy is going to run and he's going to go somewhere else because yes, service is very important.* Price is very important, number one. But service is also key, right? So when you're trying to get more freight, the guy will say, yes, how is your service? Well, my service is great. Okay, I'll give you a chance. *And then if you don't provide the right service, then he's going to walk and you're going to have lots of churn. So that's one thing that a TForce rate we have, right? We have too much churn.* So customers try us, and we fail a bit, okay, the guy goes away. So by improving service, you reduce the churn. By reducing the churn, you improve your volume, right? So this has been key to us.
>
> In terms of our peers the fact that some of our peers invested heavily in real estate. I mean, we haven't seen anything so far. But I'm just saying that the market is really soft. So people are—some people are trying to chase rate and grow the volume.
>
> Our focus for us is not to chase freight, it's we have to fix our service first and reduce our costs and then reduce the churn so that we start growing organically because if you get 3,000 shipments more a day, but you lose 3,000 because of the churn, well, you're back to zero. *So you got to fix the service so that you can reduce the churn of customer.*

*Id.* (emphasis in original).

Finally, after acknowledging that Bédard had "been asked a lot about service and service improvement on [the] call," an analyst offered to frame that question "slightly differently." *Id.* ¶ 93. He noted that, compared to the previous year, "customers' perception of [TForce's] service level" was "roughly the same" in that it was "still sort of, unfortunately at the lower range compared to your other public LTLs," despite the fact that some other public LTLs had "actually improved" over the same period. *Id.* The analyst then asked Bédard why he thought, "after all the . . . very hard work that [he] and [his] team ha[d] been doing," TForce had not "shown an improvement" over the year, and whether analysts should expect to "see some dramatic improvement on any of those"

service-related issues, like “the damage, the shortage, the on-time pick ups[, and] deliveries” in the next calendar year. *Id.* In response, Bédard stated:

> Yes. Well, like I said earlier on the call, I mean, it's a disappointment to me when you look at the claims where we were heading in the right direction, and then path, I mean, over the last nine months a year. *Now our claims cost is going in the wrong direction. So guys, let's refocus on that. So that does not help us with the valuation that our customers are doing a bus in terms of service. Claim is a problem, right? Because when you break the guy's stuff, he doesn't like you, right? So that's number one, where we have not improved.* So this is why we are at the bottom of the pack, number one.
>
> *Number two, if you don't show up for pick up, nobody likes that because then you're stuck with the freight on your dock, right? And then you have to either call someone else or hopefully Q4 ratio is up tomorrow. Customers don't like that, right? So this is under our control, and we have to do a much better job at it. So this is why we have not improved, okay?* And this is why, like I was saying earlier, there's an evolution in the bonus program that we have with our sales team and our management team. So it shows that the program that we have right now in '24 is not good because we're not getting the result that we're supposed to get, right? *So we will have to improve the bonus plan so that these guys bonuses aligned to what we want them to perform.*
>
> *So being improved service don't break the stuff, don't lose it, show off or pick up, et cetera, et cetera.* And then the guys will have to take that seriously because then the incentive, the bonus is gone, right? But that's an evolution because where we were with the bonus system when we bought the company, it was just, I mean, unacceptable, right? *So it's been an evolution. But I mean this report—this [Mastio] report is a major disappointment for me. And I'm going to be with the team tomorrow as a matter of fact, and for sure, we'll be talking about that guys, I mean, we're still at the bottom of the pack. We have not improved.*

*Id.* (emphasis in original).

The complaint alleges that these statements were materially misleading because they failed to disclose that the WorldShip transition had contributed to operational issues with order placement, missed pickups, and billing, which in turn impacted shipping volume, customer perceptions of TForce’s service, churn, and earnings pressure. *Id.* ¶¶ 88, 90, 92, 94.

*3. Form 6-K Risk Warnings & Certifications*

The complaint also challenges statements made in TFI's 1Q24, 2Q24, and 3Q24 6-Ks, which were filed on April 25, 2024, July 25, 2024, and October 21, 2024, respectively. *Id.* ¶¶ 65, 75, 81. Each of those forms included a management discussion and analysis ("MD&A") section with the following statements:

> **Acquisitions and Integration Risks.** Historically, acquisitions have been a part of the Company's growth strategy. The Company may not be able to successfully integrate acquisitions into the Company's business, or may incur significant unexpected costs in doing so. Further, the process of integrating acquired businesses may be disruptive to the Company's existing business and may cause an interruption or reduction of the Company's business[.]
>
> Given the nature and size of UPS Freight, as well as the structure of the acquisition as a carveout from UPS, the acquisition of UPS Freight presents the following risks, in addition to risks noted elsewhere in these risk factors:
>
> - a large portion of the business of UPS Freight prior to the acquisition was with affiliates of UPS. While there are transportation service agreements in effect with such affiliates of UPS, such affiliates may decide to reduce or eliminate business with the Company in the future and we have limited contractual protections to prevent the loss of such business;
> - *some of the information and operating systems of UPS Freight were integrated with UPS prior to the acquisition. The Company is in the process of transitioning such systems and could experience disruptions during the transition or difficulty or delay in building its systems and personnel to operate them;*
> - the Company had limited experience in the U.S. LTL market prior to the acquisition and we may be unsuccessful in integrating UPS Freight and operating it profitably.

*Id.* (emphasis in original). Bédard and Saperstein also filed certifications that they had "reviewed the interim financial report[s] and interim MD&A[s]." *Id.* ¶¶ 67, 69, 77, 79, 83, 85. The certifications further stated:

> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

*Id.* The complaint alleges that, contrary to these certifications, the 1Q24, 2Q24, and 3Q24 6-Ks were materially misleading because they (1) implied that TFI had not yet experienced material disruptions, difficulties, or delays from the transition from UPS systems; and (2) omitted the same material risks and facts that Bédard failed to disclose during his earnings calls. *Id.* ¶¶ 66, 76, 82.

**F. Additional Scienter Allegations**

In the "Additional Scienter Allegations" section of their complaint, the plaintiffs also highlight that, during the 2Q24 and 3Q24 earnings calls, Bédard made the following statements:

- "[F]or us, our focus at TForce Freight is really, really to be more lean and mean, to be more efficient. For sure, we are implementing new technology within this company in terms of line-haul, in terms of billing, master file and all that." *Id.* ¶ 115.
- "[TFI is] focused on the details, including quality of service that drives volumes. We are focused on freight quality, maximizing weight and revenue per shipment and always striving for cost management through greater efficiencies. . . . [It] is so important that our focus for us is to keep what we've got in terms of volume, try to improve it, try to grow it slowly." *Id.* ¶ 116.
- "[W]e have to work with our team, our terminal managers to really adjust on a daily basis our costs versus the volume that we have, okay? That's number 1." *Id.* ¶ 117.
- "[T]he start of October was a little bit depressed in terms of volume. And the reason being is that we had issues in the Carolinas. We had issues in Georgia. We had some issues in Florida, et cetera, et cetera." *Id.*

## II. PROCEDURAL HISTORY

Brownbridge filed an initial complaint on March 14, 2025, which asserted claims on behalf of putative class members who purchased TFI securities between April 26, 2024, and February 19, 2025, inclusive. Docs. 1, 5. A member of the putative class, Patricia Douglass, then filed a motion to be appointed lead plaintiff, which the Court granted in an opinion and order dated August 28, 2025.[12] Doc. 18. After the plaintiffs

---

[12] The Court also granted Douglass's unopposed motion to appoint lead counsel in the same opinion. Doc. 18 at 9.

amended the complaint on October 24, 2024, the defendants moved to dismiss the complaint for failure to state a claim on December 19, 2025. Docs. 21, 23.

## III. LEGAL STANDARD

### A. Failure to State a Claim

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Pleading Securities Fraud

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *ATSI Communications, Inc. v. Shaar Fund, Limited*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## IV. DISCUSSION

The Court begins with the plaintiffs' claim that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. "To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351–52 (2d Cir. 2022). The defendants argue that the complaint should be dismissed because it fails to plead scienter, a misstatement, or loss causation. Doc. 24 at 8. The Court's inquiry begins—and ends—with scienter.

**A. Scienter**

*1. Legal Standard*

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). A "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Resources Corp. Securities Litigation,* 26 F. Supp. 3d 278, 299 (S.D.N. Y. 2014) (quoting *Tellabs*, 551 U.S. at 322–23).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).

"If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonable' behavior or that which evinces 'an extreme departure from the standards of ordinary care.'" *Arkansas Public Employees*, 28 F.4th at 355 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged [the] defendants' knowledge of facts or access to information contradicting their

public statements." *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 146 (2d Cir. 2025). That is because, "[u]nder such circumstances, [the] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*

*2. The Individual Defendants' Scienter*

The defendants first argue that the claims against the individual defendants should be dismissed because the complaint fails to allege that they acted with scienter. Doc. 24 at 13–14. The plaintiffs do not dispute that the complaint fails to allege that any defendant had the motive or opportunity to commit fraud. Doc. 27 at 23–24. But they contend that the complaint offers strong circumstantial evidence of conscious misbehavior or recklessness based on: (1) Bédard's public statements, (2) the confidential witness allegations, (3) the core operations doctrine, and (4) the certifications. *Id.* at 24–28. The Court considers each argument individually before analyzing their impact as a whole.

*a. Bédard's Public Statements*

In general, when defendants hold themselves out as "deeply knowledgeable" about the subject matter of an alleged misstatement, courts have found that these "self-portrayals" can support an inference of scienter. *Leone v. ASP Isotopes Inc.*, 811 F. Supp. 3d 563, 609 (S.D.N.Y. 2025) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985)); *see also In re Dentsply Sirona, Inc. Securities Litigation*, 816 F. Supp. 3d 449, 484 (S.D.N.Y. 2026) (collecting cases). Courts have also inferred scienter when defendants have represented they "actively monitor" the subject of the challenged statements. *In re Avon Securities Litigation*, No. 19 Civ. 01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019); *see also*, *e.g.*, *In re Dentsply Sirona*, 816 F. Supp. 3d at 484 (relying on the defendant's representation that he monitored the subject matter of the alleged misrepresentation "week-by-week" and "day-by-day"). Courts have reasoned that both types of representations support a strong inference of scienter insofar

as they suggest that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 312.

The plaintiffs attempt to rely on this caselaw by contending that Bédard held himself out as "knowledgeable about TForce's plans to upgrade its technology systems and the timing of those plans" and represented that he was "closely monitoring TForce's operational metrics, its efforts to improve service, and the drivers of its volume and yields." Doc. 27 at 24. To support this contention, their brief highlights two statements that Bédard made during the 1Q24 earnings call. *Id.* The first is Bédard's statement, in response to a question about whether TFI could sustain positive trends in volume and yield given the freight recession, that "we will be improving our freight billing system, our master file, . . . by the end of the year." Doc. 21 ¶ 71. The second is Bédard's statement that, "if you don't monitor [missed pickups], you can't improve. So this is something that we put in place to make sure that we monitor that." *Id.* ¶ 73. The plaintiffs also rely on the allegations in the "Additional Scienter Allegations" section of the complaint. *Id.* ¶¶ 115–17.

The plaintiffs argue that these statements support an inference of scienter because Bédard "held himself out as knowledgeable about the technology transition occurring at TForce and claimed he was closely monitoring operational performance." Doc. 27 at 24. But these statements are too vague and generalized to carry any weight. For one, Bédard's acknowledgement that TFI would update its freight billing system by years' end was not an expression of expertise regarding that effort—or the specific impact of the WorldShip cutoff in that transition. Thus, the Court cannot say that his reference to the transition reflects the kind of "deep[] knowledge[]" about the WorldShip cutoff that would suggest that he knew or should have known that his failure to disclose the potential or alleged impact of that cutoff was misleading. *Leone*, 811 F. Supp. 3d at 609 (S.D.N.Y. 2025).

And to the extent that Bédard broadly referred to TFI's efforts to improve service and volume in earnings calls, these general statements do not support an inference of scienter for the same reason. At bottom, these statements suggest no more than a general familiarity with and commitment to improve the company's operations.[13] *See In re Nokia Oyj (Nokia Corp.) Securities Litigation*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (rejecting the plaintiffs' "generalized allegations" that the defendants "h[eld] themselves out as knowledgeable about [the company's] products in presentations" as "insufficient, as a matter of law, to establish scienter"). Thus, they cannot establish that Bédard knew or should have known that his failure to disclose the WorldShip cutoff specifically would be materially misleading.

Nor is the Court persuaded by the plaintiffs' contention that Bédard "closely monitor[ed] operational performance." Doc. 27 at 24. For one, Bédard's statements do not support the plaintiffs' assertion that Bédard was *personally* "monitoring TForce's operational metrics, its efforts to improve service, and the drivers of its volume and yields." *Id.* Nor do they suggest that Bédard's familiarity with any data was "close[]" in the sense that courts have considered sufficient to infer scienter. *Id.*; *see also In re Dentsply Sirona*, 816 F. Supp. 3d at 484 (relying on the defendant's representation that he met to discuss patient injury data "on a quarterly basis" and monitored onboarding procedures "week-by-week" and "day-by-day"); *In re Avon*, 2019 WL 6115349, at *19–20 (relying on the defendants' representations that they received "daily updates," "monthly forecasts," and "quarterly" reviews of data regarding "the effect of delinquencies," but failed to acknowledge the "rising delinquency rate").

---

[13] It is for this reason that the plaintiffs' reliance on *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012), is inapposite. There, the plaintiffs alleged that the defendants misrepresented and failed to disclose problems with the performance of a specific division and alleged that the individual defendants "made specific statements about the projections and performance of" that division. *Id.* at 372. And the court found that the "*specificity* of these statements [was] strong circumstantial evidence that [the individual defendants] were receiving some form of specific information on" that division. *Id.* (emphasis added). Here, by contrast, the plaintiffs do not allege that Bédard made any specific statements about the WorldShip cutoff or its impact.

And even if they did, the plaintiffs do not specify how these operational metrics would support an inference of scienter. Indeed, in general, "[w]here plaintiffs contend [that] defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309). But here, the plaintiffs do not identify any specific data that Bédard allegedly received. Nor do they explain how this data would have notified him about the alleged impact of the WorldShip cutoff—and thus shown him that he was "misrepresenting material facts related to the corporation."[14] *Gimpel*, 156 F.4th at 146. Thus, the plaintiffs' vague claim that Bédard reviewed operational and service data does not support an inference of scienter. *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (explaining that "courts have routinely dismissed" claims that defendants had access to company data "as too vague to support an inference of scienter" where "plaintiffs failed to identify the specific facts contained in the data or how such facts would have contradicted defendant's statements").

*b. Confidential Witness Allegations*

The plaintiffs also contend that their confidential witness allegations support an inference of scienter, because they show that "the problems with the impending UPS cut-off were well-known to TForce management before the cutoff," and that "after the cutoff, there was an immediate decline in volume and an increase in churn over a longer period as small and medium sized customers became alienated by billing and shipping errors and difficulties in placing orders." Doc. 27 at 25.

However, the complaint does not allege that any of the confidential witnesses' concerns—or the information underlying them—were ever presented to the individual

---

[14] The complaint's allegations that the WorldShip cutoff "caused a material degradation of service[] [and] missed pickups" and "material decline in volume" are conclusory and therefore need not be accepted as true. *See, e.g.*, Doc. 21 ¶¶ 76(c)(2)–(3).

defendants. This omission is "fatal" to the plaintiffs' attempt to tie these allegations to the individual defendants' scienter. *In re Citigroup Inc. Securities Litigation*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010). Nor can the plaintiffs avoid this outcome through asserting that the confidential witnesses' knowledge and concerns were widespread. *See id.* ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity."); *In re SolarEdge Technologies, Inc. Securities Litigation*, No. 23-CV-9748 (GHW), 2025 WL 1031154, at *11 (S.D.N.Y. Apr. 6, 2025) (rejecting the plaintiffs' "conclusory allegations that 'the whole company knew' about" facts that would contradict the alleged misstatements).[15]

To be sure, the plaintiffs also highlight that CW1 "repeatedly warned" Hall and McGonigal "about the material volume loss that would occur upon the WorldShip cutoff, and [that] these individuals reported directly to Bédard." Doc. 27 at 26. But to show that the defendants had access to contrary information, the plaintiffs must "provide specific instances in which [the d]efendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010). In line with this rule, courts in this Circuit have repeatedly rejected "attempts to hold senior officers liable based on their position and complaints to 'senior management' in the absence of specific allegations that the named defendant actually received information about the fraud." *In re Veon Ltd. Securities Litigation*, No. 15-CV-08672 (ALC), 2018 WL 4168958, at *18

[15] To the extent that *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005), suggests otherwise, it is inconsistent with the weight of authority in this Circuit. In any event, the complaint in that case is distinguishable insofar as it contained allegations from numerous witnesses that contrary information was widely known, as opposed to the single allegation of widespread knowledge here. *Id.* at 504. The allegations of widespread knowledge in that case were also supported by additional facts, including an announcement to employees regarding the relevant information. *Id.*

(S.D.N.Y. Aug. 30, 2018). Thus, CW1's warnings to Bédard's direct reports are "entitled to no weight." *Chen v. X Financial*, No. 19-CV-6908 (KAM) (SJB), 2021 WL 7449851, at *11 (E.D.N.Y. Dec. 9, 2021).

In resisting this conclusion, the plaintiffs assert that confidential witnesses are not required to "have direct knowledge of the defendants' state of mind." Doc. 27 at 26 (quoting *City of Warren Police & Fire Retirement System v. World Wrestling Entertainment Inc*., 477 F. Supp. 3d 123, 137–38 (S.D.N.Y. 2020)). It's true that "facts supporting the inference that the executive in question received the contrary information . . . need not come from any eyewitness or a fly on the wall." *In re Turquoise Hill Resources Ltd. Securities Litigation*, 625 F. Supp. 3d 164, 245 (S.D.N.Y. 2022). "They can also come in the form of allegations supporting that the information and the context were such that the executive would have had to be informed." *Id.* But here, the complaint pleads no non-conclusory facts that suggest that knowledge about the risks and impact of the WorldShip cutoff was so "widespread" as to support that inference. *In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319, 350 (S.D.N.Y. 2004); *see, e.g.*, *id.* at 350–51 (finding that an inference of scienter was supported where the complaint cited, "in considerable detail, a host of internal correspondence and documents demonstrating widespread internal knowledge of the schemes plaintiffs allege, which spanned from the bottom of the company to its top reaches"); *In re Turquoise Hill Resources*, 625 F. Supp. 3d at 245 (inferring scienter where a senior executive specifically hired an employee "to look into problems" at a mine, the employee "made regular—and alarming—reports back" to an intermediate supervisor that reported to the senior executive, and the intermediate supervisor sent an email to the employee promising to "have a discussion" with the senior executive about those problems "*again*"); *City of Warren*, 477 F. Supp. 3d at 137–38 (inferring scienter based on the defendants' "senior positions," the "importance" of the subject matter "to their employers' revenue," the disparity between the representations and the relevant facts, and the complaint's

"allegations of motive"). The plaintiffs instead simply suggest that, because the confidential witnesses had concerns about the WorldShip cutoff—and shared these concerns with senior managers—these concerns must have been apparent to the individual defendants. But the caselaw is clear that such allegations are insufficient.

Nor do the confidential witnesses' allegations about the impact of the WorldShip cutoff suggest that either of the individual defendants "would have had to be informed" about it after the fact. *In re Turquoise Hill Resources Ltd.*, 625 F. Supp. 3d at 245. At bottom, the confidential witnesses' allegations in this respect are vague and conclusory. *See, e.g.*, Doc. 21 ¶ 49 (alleging that that on "day one" of the transition there was a "significant volume loss"); *id.* ¶ 50 (alleging that there was a "dramatic drop . . . in business . . . in June, July 2024" and "a lot of it had to do with internal tech issues"); *id.* ¶ 51 ("When [the WorldShip cutoff] happened, revenue dropped across the country."); *id.* ¶ 52 ("When we tried to move away completely from UPS, that's when we started having issues."); *id.* ¶ 62 ("[W]hen we came off that software, it was a dramatic drop in customers."); *id.* ¶ 63 ("[W]e pulled out [of WorldShip], in the middle of the year, and we lost some mid-market or smaller business, which are typically profitable."). At most, the confidential witnesses allege that TForce experienced a "significant" reduction in business and revenues after the WorldShip cutoff. But that assertion is inherently subjective. It is also conclusory, insofar as it echoes the materiality requirement. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (explaining that a complaint is required to "alleg[e] a statement or omission that a reasonable investor would have considered significant in making investment decisions."). Thus, without further detail or corroboration, the confidential witnesses' allegations regarding the impact of the WorldShip cutoff need not be credited. *See Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 450 (S.D.N.Y. 2025) (rejecting confidential witness allegations that were "general in nature" and "devoid of details lending themselves to corroboration"), *aff'd in relevant part, vacated in part on other grounds*, No. 25-964-CV, 2026 WL 668890 (2d

Cir. Mar. 10, 2026); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 (S.D.N.Y. 2020) (explaining that "allegations by [confidential witnesses] that are insufficiently particular are apt to be discounted or disregarded"); *In re Sierra Wireless, Inc. Securities Litigation*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (rejecting confidential witness allegations that "merely parrot[ed] the conclusory allegations contained in the complaint").

*c. Core Operations*

The plaintiffs also argue that the individual defendants' scienter may be inferred from the core operations doctrine. "That doctrine posits that 'scienter may be imputed to key officers who should have known facts relating to the core operations of their company.'" *Smith v. Gap, Inc.*, 177 F.4th 405, 413 (2d Cir. 2026) (quoting *Gimpel v. Hain Celestial Group, Inc.*, 156 F.4th 121, 148 n.19 (2d Cir. 2025)). In other words, it "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, even without specific allegations that senior management had actual knowledge of such information." *In re Avon*, 2019 WL 6115349, at *20. "Core operations include matters critical to the long term viability of the company and events affecting a significant source of income." *Id.* (quotations omitted). The Second Circuit has not "clearly affirmed the validity of the core-operations doctrine following the passage of the PSLRA." *Smith*, 177 F.4th at 413. However, it has "suggested that the doctrine can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently." *Id.* at 413–14.

The defendants contend that the core operations doctrine cannot apply here because the complaint does not allege that WorldShip constituted a sufficiently large proportion of TFI's business. Doc. 24 at 14. In support of this contention, they rely on caselaw in which courts "have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'"

*In re Barrick Gold Corp. Securities Litigation*, 341 F. Supp. 3d 358, 374 (S.D.N.Y. 2018) (quoting *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011)). In response, the plaintiffs argue that the core operations doctrine does not impose such a "bright-line rule" and instead may apply even where the operation constitutes a significant minority of the company's revenue. Doc. 27 at 27–28 (citing *Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019); *In re Avon*, 2019 WL 6115349, at *20; and *In re Hi-Crush Partners L.P. Securities Litigation*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013)). And they contend that the doctrine supports an inference of scienter here because TForce was responsible for 35.3% of TFI's total revenue in fiscal year 2023—and therefore constitutes a core operation under those precedents..[16] *Id.* at 27.

But to support an inference of scienter, it is not enough to show that *TForce* in general was a core operation of TFI. The plaintiffs must instead show that the subject matter of the alleged misstatement—that is, WorldShip—was a core operation. "Otherwise, the particularized pleading requirements imposed by Rule 23.1 would too readily dissipate in the face of any allegation that wrongdoing in a seemingly important project implicates the 'core operation' principle." *In re SAIC Inc. Derivative Litigation*, 948 F. Supp. 2d 366, 384–85 (S.D.N.Y. 2013), *aff'd sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014); *see also Smith*, 177 F.4th at 414 (rejecting the application of the core operations doctrine because "although [the p]laintiffs allege[d] generally that inventory and Old Navy itself constitute Gap's 'core operations,' they never attempt[ed] to quantify the importance of" the specific subject of the alleged misstatements "to those

[16] The plaintiffs arrive at this figure through adding TForce's base freight and GFP revenues for fiscal year 2023 and dividing it by TFI's total revenue before fuel surcharge for that same fiscal year. Doc. 27 at 15 & n.5. The defendants argue that GFP revenue should be excluded from this calculation because it "has nothing to do with TForce using WorldShip to book and bill its own shipments." Doc. 29 at 11 n.3. The Court assumes favorably to the plaintiffs that the relevant figure is 35.3%, but concludes that the distinction is immaterial for the reasons explained below.

operations"); *Gimpel*, 156 F.4th at 148 (considering "the importance of th[e] alleged fraud" to the company). And here, even assuming that the core operations doctrine applies to matters that represent less than "nearly all" of a company's business, the plaintiffs have not shown that the WorldShip transition was "critical to the long term viability of the company" or "affect[ed] a significant source of [its] income." *In re Avon*, 2019 WL 6115349, at *20. That is so for several reasons.

For one, the plaintiffs do not attempt to meaningfully quantify the significance of WorldShip to TFI's overall revenue. Indeed, the complaint is devoid of any allegations regarding the relative share of TFI revenues that were derived from WorldShip customers. The plaintiffs do allege that approximately 10% of TForce's shipments were placed through WorldShip. Doc. 21 ¶¶ 4, 39. But, as the plaintiffs themselves note, the relative *volume* of WorldShip shipments is different from the relative *revenue* that was ultimately derived from these shipments. Doc. 27 at 15. And although the plaintiffs attempt to bridge this gap through arguing that WorldShip shipments "necessarily accounted for" more than 10% of TForce's revenues and profits because "the customers who used WorldShip most heavily were small and mid-sized customers" with the "best margin[s]," this contention simply invites impermissible speculation..[17] *Id.*

Nor do the plaintiffs allege any facts that would otherwise suggest that WorldShip was critical to TFI's business. For example, the complaint does not allege that WorldShip was "a subject about which investors and analysts often inquired" or "key to measuring [TFI']s financial performance." *New Orleans Employees Retirement System v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011). Nor do the plaintiffs allege, for example, that WorldShip or its transition was "top-down priority" involving "top [TFI] executives and the company's most important" customers. *Gimpel*, 156 F.4th at 49.

---

[17] Nor can the plaintiffs rely on the confidential witnesses' allegations regarding the impact of the WorldShip cutoff for the reasons already explained.

Perhaps in recognition of this infirmity, the plaintiffs argue that the "UPS cutoff *wasn't* just limited to WorldShip" because "the end of the UPS integration forced TForce to manually enter shipping information, sending revenue falling across *all* segments." Doc. 27 at 27–28. But the complaint is not premised on the end of UPS integration in general; it is focused on the cutoff from WorldShip specifically—and the loss of customers who used that platform. *See, e.g.*, Doc. 21 ¶ 4 (alleging that TFI "failed to disclose that the termination of the WorldShip integration would lead to a sudden, sharp volume loss, as customers who previously scheduled pickups with TFI through WorldShip could no longer do so using that platform"); *see also id*. ¶¶ 66, 72, 74, 76, 82, 88, 90, 92, 94 (similarly focusing on WorldShip). Thus, the plaintiffs' reference to the broader UPS transition cannot salvage their core operations argument. And, even if the complaint was premised on end of UPS integration, the plaintiffs do not allege any non-conclusory facts that suggest that that broader transition was "critical to the long term viability of the company" or "affect[ed] a significant source of [its] income." *In re Avon*, 2019 WL 6115349, at *20. Thus, the core operations doctrine is inapplicable here.[18]

*d. Certifications*

The plaintiffs finally argue that scienter may be inferred from the individual defendants' SEC certifications. Doc. 27 at 28. However, the caselaw is clear that such certifications cannot support a finding of scienter absent more particularized allegations. *See In re MBIA, Inc., Securities Litigation*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010); *In re Molycorp, Inc. Sec. Litig.*, No. 13 Civ. 5697 (PAC), 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015).

* * *

---

[18] The Court also notes that the plaintiffs have not offered any scienter allegations for the core operations doctrine to supplement. Thus, they cannot use the doctrine to create an independent basis to infer scienter. *See In re Molycorp, Inc. Securities Litigation*, No. 13 Civ. 5697 (PAC), 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) (explaining that the core operations doctrine cannot independently support an inference of scienter).

Taken together, the complaint offers no allegations that support an inference that the individual defendants knew or should have known that they were misrepresenting any material facts with respect to TFI or WorldShip. And, "[a]s the Second Circuit has recognized in a number of contexts, '[z]ero plus zero is zero.'" *In re Barrick Gold Corp.*, 341 F. Supp. 3d at 374 (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011)). Thus, the plaintiffs have not pled a strong inference that Bédard or Saperstein acted with scienter.

*3. Corporate Scienter*

To plead corporate scienter, a plaintiff must plead facts that support "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex Capital Inc.*, 531 F.3d at 195.

The Second Circuit has explained that there are three ways to satisfy this requirement. The first and "most straightforward" way to plead corporate scienter "is to impute it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Second, scienter may be imputed from other officers or directors—even if they did not themselves make the challenged statements—if the plaintiff shows that they were "involved in the dissemination of the fraud" and thus offers "connective tissue between those employees and the alleged misstatements." *Id.* at 98–99; *see also Silvercreek Management, Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) ("[U]nder Second Circuit precedent, it is not enough to *separately* allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two."). Third, in "exceedingly rare instances," a statement may be so "dramatic" that the statement itself supports a strong inference of "collective corporate scienter," because "senior officers must have known that the challenged statements were false." *Jackson*, 960 F.3d at 99 (quoting *Dynex*, 531 F.3d at 195–96). For example, if "General Motors announced that it had sold one million SUVs in 2006, and the actual

number was zero," that statement would be sufficient to support a strong inference of corporate scienter, "since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Dynex*, 531 F.3d at 195–96 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). In all three cases, "a plaintiff must show that the misstatement was not a case of mere mismanagement, but rather the product of collective fraudulent conduct." *Jackson*, 960 F.3d at 96.

Here, the first option is not available to the plaintiffs because they have not shown that either of the individual defendants acted with scienter. Nor are the challenged statements "so dramatic" that they invoke the "exceedingly rare" third option. *Jackson*, 960 F.3d at 99. That means that, to plead a strong inference of corporate scienter, the plaintiffs must allege "connective tissue" between an employee who had scienter and the alleged misstatements. *Id.* The plaintiffs argue that they have offered the requisite connection because they allege that "McGonigal was present at multiple meetings where [CW1] warned about a material loss in volume as soon as the WorldShip cutoff were to happen," "McGonigal reported directly to Bédard," and Bédard made statements that "support a strong inference that McGonigal furnished information to Bédard about TForce's technology transition, service issues, and operating performance." Doc. 27 at 29. They contend that given these facts, "the most plausible inference is that McGonigal shared this information with Bédard." *Id.* But these arguments are merely a recitation of the plaintiffs' arguments that Bédard acted with scienter—which the Court has rejected for the reasons just explained.

The plaintiffs also argue that, even if McGonigal did not share CW1's warnings with Bédard, it would have been "incredibly reckless" for him to neglect to do so "when he knew Bédard was providing regular updates to investors about TForce's operational performance and the drivers of its results." *Id.* They contend that "[g]iven the high-ranking nature of McGonigal's position, this recklessness may be imputed to TFI." *Id.*

But this argument, too, lacks merit. For one, the plaintiffs' argument operates at too high a level of generality: just because McGonigal knew that Bédard *generally* updated investors on TForce's operations and performance, does not mean that he was reckless in failing to *specifically* raise to Bédard CW1's concerns about WorldShip, especially given the absence of any indication that WorldShip or the WorldShip transition played a significant role in TFI's financial performance. *See Kalnit*, 264 F.3d at 142 (explaining that reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it"); *Jackson*, 960 F.3d at 96 ("Where the defendant is a corporation . . . a plaintiff must show that the misstatement was not a case of mere mismanagement, but rather the product of collective fraudulent conduct."). Nor have the plaintiffs alleged that McGonigal was "involved in the dissemination of the fraud" through, for example, "crafting or reviewing the challenged statements." *Jackson*, 960 F.3d at 99. Absent such "connective tissue," the Court can "only guess . . . whether it would otherwise be fair to charge [TFI] with [his] knowledge." *Id.* Thus, the plaintiffs have not raised a strong inference of collective corporate scienter..[19]

---

[19] The cases cited by the plaintiffs do not suggest a contrary result. In *Pennsylvania Public School Employees' Retirement System v. Bank of America Corp.*, the court found that the alleged misstatements "would have been approved by corporate officials sufficiently knowledgeable about the company to know that [they] were false" because the complaint alleged fraudulent conduct and knowledge by various senior officers, including the company's general counsel, vice president, assistant vice president, and several senior managers. 874 F. Supp. 2d 341, 363–64 (S.D.N.Y. 2012). Here, by contrast, the plaintiffs premise their corporate scienter argument on a single officer, McGonigal. And, since *Pennsylvania Public School Employees' Retirement System* was decided, the Second Circuit has explained that the means of pleading corporate scienter that the district court relied on applies only in "exceedingly rare" circumstances. *Jackson*, 960 F.3d at 99. Similarly, *In re Moody's Corp. Securities Litigation* relied on "specific statements indicating that various top officials knew" that the corporation's statements were inaccurate; in addition, and more importantly, the plaintiffs had already alleged that the speaker of alleged misstatements acted with scienter. 599 F. Supp. 2d 493, 515–16 (S.D.N.Y. 2009), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009). Thus, that case distinguishable on both grounds. And *In re Dentsply Sirona, Inc. Securities Litigation* is inapposite because the plaintiffs had "link[ed] employees with knowledge to the makers of the alleged misstatements": the complaint alleged that the individuals who made the misstatements not only had access to data that contradicted their statements—and would have

* * *

In sum, the complaint does not plead facts that, taken together, raise a strong inference of individual or corporate scienter. Because this independently forecloses the plaintiffs' Section 10(b) claim, the Court need not address the defendants' remaining arguments for dismissal of that claim. And absent a viable Section 10(b) claim, the plaintiffs' Section 20(a) claim must also be dismissed. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## V. CONCLUSION

For the reasons set forth above, the motion is therefore GRANTED and the complaint is DISMISSED without prejudice. The plaintiffs are directed to file an amended complaint, if at all, by October 26, 2026. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 23, 30.

It is SO ORDERED.

Dated: September 28, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.

revealed issues that were "high enough in absolute terms to force the business to shut down"—but also met regularly with a vice president to discuss the subject of that data. 816 F. Supp. 3d 449, 481–82 (S.D.N.Y. 2026).